**HEARY BROS. LIGHTNING PROTECTION CO., INC., et al., Plaintiffs,**

v.

**LIGHTNING PROTECTION INSTITUTE, et at., Defendants.**

**No. CV962796PHXROS.**

United States District Court, D. Arizona.

Oct. 23, 2003.

Michael Lee Parrish, Stinson, Morrison, Hecker, LLP, Phoenix, AZ, Linda H. Joseph, Schroder, Joseph & Associates, LLP, Buffalo, NY, for Plaintiffs.

Deana S Peck, Esq., David Geoffrey Bray, Esq., Quarles & Brady, Streich, Lang, LLP, Debra Ann Sirower, Esq., Bryan Cave, LLP, Edwin F. Hendricks, Sr., Esq., Paul Lincoln Stoller, Meyer, Hendricks & Bivens, PA, Joseph A. Kula, Esq., Law Offices of Joseph A. Kula, John C. Gemmill, Esq., Sanders & Parks, PC, Kendall Douglas Steele, Esq., Jardine, Baker, Hickman & Houston, PLLC, Jon D. Schneider, Esq., Jennings, Strouss & Salmon, PLC, Phoenix, AZ, Maureen Brodoff, National Fire Protection Association, Quincy, MA, Stacey Anne Mahoney, Constantine & Partners, PC, New York, NY, Barbara Janet Forde, Esq., Chickasha Cotton Oil Co., Chandler, AZ, Ronald Lynn Snelling, Snelling, Christensen & Laue, PA, Minneapolis, MN, Mark Alan Glick, Parsons, Behle & Latimer, LLC, Salt Lake City, UT, Elizabeth Paula Gilson Elizabeth P. Gilson Attorney at Law, New Haven, CT, for Defendants.

## ORDER

SILVER, District Judge.

This case presents a variety of complex antitrust and false advertising issues in dispute among the parties, all participants in the lightning protection system industry. On March 31, 2003, the Court issued preliminary rulings on a number of pending motions, and on May 2, 2003, the Court held a hearing and heard arguments on all pending motions, including those with preliminary rulings. This Order resolves all pending motions and supersedes all previous rulings on these motions.

## I. BACKGROUND

### A. Procedural Overview

Plaintiffs are three manufacturers and distributors of lightning protections systems, Heary Brothers Lightning Protection Co., Inc. ("Heary Bros."), Lightning Preventor of America, Inc. ("LPA"), and the National Lightning Protection Corp. ("NLPC"). In or about 2001, LPA was merged into and became a division of Heary Bros. ("Heary/LPA"). Heary October Aff. ¶ 2 [Doc. # 282]. Heary/LPA manufactures and distributes two types of lightning protection systems: "conventional" systems (also known as "Faraday" or "Franklin" systems), and Early Stream Emission ("ESE") systems. Heary Oct. Aff. ¶ 3. NLPC manufactures and distributes conventional systems, and also distributes an ESE system known as the Prevectron, which is manufactured by Indelec, a French-based company. Rapp Aff. ¶ 3 [Doc. # 283].

Defendants are a number of other entities involved in the lightning protection industry. Defendant Lightning Protection Institute ("LPI") is a not-for-profit corporation that functions as a trade association of manufacturers and distributors of lightning protection systems. Second Amended Compl. ¶ 9 [Doc. # 206]. Defendant Thompson Lightning Protection Inc. ("Thompson") is a manufacturer and distributor of lightning protection systems, and Defendant Allan Steffes ("Steffes") is the Chairman, agent, and representative of Thompson. Sec. Am. Compl. ¶¶ 10–11.

Defendant East Coast Lightning Equipment, Inc. ("East Coast") is also a manufacturer and distributor of lightning protections systems. Sec. Am. Compl. ¶ 12. The President of East Coast, Charles Ackerman ("Ackerman") was originally named as a Defendant but was dismissed for lack of personal jurisdiction, though Plaintiffs continue to name him as a co-conspirator for purposes of the Sherman Act. Order of 12/4/97 [Doc. # 75]. Thompson manufactures and distributes both conventional and ESE systems, but East Coast manufactures only conventional systems of lightning protection.

In its Second Amended Complaint, Plaintiff sues Defendants on a variety of counts. Count I alleges violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, against all Defendants. Count II alleges violations of Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), against Defendants Thompson, Steffes, and East Coast. Count III alleges common law claims for unfair competition, product defamation, and civil conspiracy against all Defendants. Count IV alleges common law interference with contractual relations against Defendant East Coast. In addition, East Coast has filed a Counterclaim against all Plaintiffs, alleging violations of Section 43(a) of the Lanham Act. As further explained below, Plaintiffs' Sherman Act claim (Count I) and East Coast's Lanham Act Counterclaim remain the key issues in dispute.

## B. Statement of Facts

Plaintiffs' Sherman Act claim centers around a meeting of the National Fire Protection Association in November 1993. The National Fire Protection Association ("NFPA") promulgates a particular standard for the installation of lightning protection systems, NFPA 780. EC SSOF ¶ 3. The NFPA has maintained this standard, subject to some modifications and revisions, since 1904. DSOF ¶ 3. Light-

ning protection systems installed in conformance with NFPA 780, require a series of air terminals (commonly known as "lightning rods") spaced out over defined intervals on the protected structure, in addition to a network of ground terminations, conducting cables, and surge suppression devices. EC SSOF ¶ 4. These lightning protection systems function when lightning strikes an air terminal, and the resulting charge is dispersed safely to the ground. EC SSOF ¶¶ 2, 5. Certain organizations, most prominently the Underwriters Laboratory ("UL"), certify that conventional lightning protection systems are installed in compliance with NFPA 780. EC SSOF ¶¶ 3, 6.

ESE lightning protection systems are founded upon use of an ESE air terminal. According to its proponents, ESE air terminals function differently than conventional air terminals. The proponents of ESE terminals claim that ESEs produce greater levels of ionization at an earlier time before an imminent lightning strike than do conventional air terminals. The ionization results in a "upward streamer" which draws the lightning, such that it strikes the ESE terminal rather than any surrounding structure (hence, the name "Early Streamer Emission"). While conventional air terminals also produce "upward streamers," ESE proponents claim that the early time advantage translates into a longer upward streamer, and that this length provides a greater "zone of protection" than would a conventional air terminal standing alone.

Because ESE terminals allegedly provide an enhanced zone of protection, ESE systems require many less terminals than conventional systems, and smaller structures might require only a single terminal. ESE terminals themselves cost more than conventional terminals, but ESE systems are often cheaper than conventional

systems, because less equipment may be required, depending on the size of the structure. EC SSOF ¶ 13. While ESE terminals can be installed in compliance with NFPA 780, the added cost of multiple ESE terminals would be considerably more expensive. Proponents claim that an ESE system, installed in a configuration not in compliance with NFPA 780, can protect more area than a conventional system installed in compliance with NFPA 780.

On or about April 24, 1990, the Standards Council of the NFPA formed a technical committee (the "781 Committee") to investigate lightning protections systems using ESE technology. DSOF ¶ 7. The 781 Committee was charged with determining whether the development of a standard for ESE systems was appropriate. DSOF ¶ 7. Both Kenneth Heary, of Plaintiff Heary Bros., and Robert Rapp ("Rapp") of Plaintiff NLPC were members of the 781 Committee. DSOF ¶ 9. The 781 Committee drafted a proposed standard for the installation of ESE systems, known as the Draft or Proposed NFPA 781 Standard, which was circulated to the NFPA membership for commentary sometime in March or April 1993. DSOF ¶¶ 10–11. The NFPA received approximately 269 comments regarding the Draft NFPA 781, and these comments, together with the 781 Committee's responses, were circulated to the NFPA's membership prior to a general membership meeting on November 15–18, 1993 in Phoenix, Arizona. DSOF ¶¶ 12–13.

On November 17, 1993, the general membership of the NFPA was scheduled to vote on the Technical Committee report regarding Proposed NFPA 781. DSOF ¶ 14. The membership vote could either adopt some or all of the report, or return some or all of the report to the Technical Committee for further study. DSOF ¶ 5. A membership vote to adopt the report would *not* have resulted in the immediate adoption of the NFPA 781 standard; rather, the Standards Council would make the final judgment whether to adopt the standard on the basis of "the entire record," which included the vote taken at the NFPA general membership meeting. DSOF ¶ 6.

On or before the scheduled vote of November 17, a number of individuals, including Charles Ackerman ("Ackerman"), President of East Coast, distributed handouts opposing the adoption of NFPA outside the hotel, in the lobby, and allegedly inside the meeting room. DSOF ¶ 15. Ackerman admitted in his deposition that he was told by some staff member of the NFPA to stop distributing the handouts. Although he testified that he believed that he had a right to hand them out in a public place, and that the NFPA "kind of drew a line and told us not to hand them out towards the entrance of the meeting hall or towards the door," he also testified that he continued to distribute the handouts, saying "NFPA told us to stop. We didn't stop." Ackerman Dep. at 247–8, Exh. 6 to PSOF. David McAfee ("McAfee"), acting chairman of the 781 Committee, met with other members of the 781 Committee, including Ken Heary and Rapp, to discuss how to respond to the distribution of the handouts. PSOF ¶¶ 16–18. Based in part upon the advice of Andy O'Connor ("O'Connor"), who chaired the 781 Committee but who was unable to attend the meeting, the members of the 781 Committee reached a "consensus" that they would not dispute the handouts during the membership debate. PSOF ¶¶ 15, 19–23. McAfee met with a few officials of the NFPA, and discussed the handouts, before the November 17 vote. PSOF ¶¶ 24–30.

On November 17, the NFPA 781 report came up for vote by the general membership, and, after a short debate, was voted

to be returned to committee for further investigation. PSOF ¶¶ 33–35. William Heary, of Plaintiff Heary Bros., himself called the vote to return to Committee "overwhelming." W. Heary Dep. at 86, Exh. 13 to PSOF.

On December 7, 1993, Plaintiffs' attorney Linda Joseph ("Joseph"), on behalf of Kenneth Heary, Frederick Heary, and LPA, filed a complaint with the Standards Council, requesting that the Standards Council reject the membership vote and issue NFPA 781. PSOF ¶ 45. On January 12, 1994, the Standards Council held a hearing regarding these complaints, at which Kenneth Heary, William Heary, and Rapp were afforded the opportunity to speak. PSOF ¶¶ 46–47. On January 26, 1994, the Standards Council issued its decision, finding that it "did not agree with the contention that the processing of the document on the floor of the Fall Meeting was inappropriate." Exh. 17 to PSOF. It further concluded that "[t]here has been no serious claim, or has any evidence been presented, either that NFPA rules were not complied with, that the membership in attendance was in any way improperly stacked in opposition to the document, or that anyone was denied a fair opportunity to state their position or rebut that of their opponents." Id. The Standards Council decided to defer further action until an independent third party review was conducted. Id. This decision was appealed to the Board of Directors of the NFPA, and was upheld. PSOF ¶¶ 56–59.

Thereafter, the NFPA arranged for the National Institute of Science & Technology ("NIST") to conduct an independent third-party review of ESE technology. PSOF ¶ 60. The Report of the NIST was drafted by Dr. Richard Van Brunt, who solicited comments from various interested parties, but who authored the Report on his own. PSOF ¶¶ 68, 71–76. The NIST Report concluded that "it is nearly impossible to

make quantitatively meaningful statements or judgments about the about the performance of ESE devices in comparison to conventional Franklin rods." Exh. 28 to PSOF, at 24. He also wrote that "the precise amount by which this [ESE] enhancement in streamer initiation improves the lightning attraction efficiency of an air terminal remains questionable. There is reason to doubt that it significantly extends the maximum range of protection." Id. at 25.

On July 18, 1995, the Standards Council held a hearing at which Dr. Van Brunt spoke, as well as various proponents and opponents of NFPA 781, including Rapp, William Heary, and Kenneth Heary. PSOF ¶¶ 83–87. The Standards Council then issued a decision in which it determined that there was insufficient technical evidence to justify adopting a new standard, and decided to disband the 781 Technical Committee. PSOF ¶¶ 88–90. The decision was appealed to an Appeals Subcommittee of the NFPA Board of Directors, who reviewed the entire record and upheld the decision of the Standards Council. PSOF ¶¶ 98–102.

On December 20, 1996, Plaintiffs initiated this lawsuit, naming the NFPA as a Defendant. In October 1998, Plaintiffs settled with the NFPA, releasing them from all claims of liability in this action in exchange for a reconsideration of its decision to not issue NFPA 781. DSOF ¶¶ 105-7. The NFPA agreed to consider the results of an independent third-party investigation, conducted by a panel led by Dr. John Bryan (the "Bryan Panel"), into the scientific basis of ESE technology. DSOF ¶¶ 109–10. The Bryan Panel received input from both proponents and opponents of ESE technology, and issued its Report on September 1, 1999. DSOF ¶¶ 111–116. The Bryan Report was critical of the scientific basis for a standard for

both ESE technology and conventional lightning protection systems. Exh. 38 to DSOF; DSOF ¶¶ 117–119, 122. On April 28, 2000, based upon the conclusions of the Bryan Report, the Standards Council again issued a decision not to adopt NFPA 781. Exh. 41 to DSOF; DSOF ¶ 126. The decision was appealed to an Appeals Subcommittee of the Standards Council, which affirmed the decision and dismissed the appeal on October 6, 2000. DSOF ¶¶ 134–38.

In proceedings parallel to their attempt to convince the NFPA to issue 781, Plaintiffs launched an attack on the validity of NFPA 780 before the Standards Council, proposing that it be withdrawn for lack of supporting scientific evidence. Plaintiffs' claim, throughout numerous proceedings before the NFPA, and before this Court as well, has been that the NFPA has applied disparate and discriminatory criteria in evaluating the supporting consensus of 780 and 781. Rapp's initial request to withdraw 780, in 1995, was denied by the Standards Council. PSOF ¶¶ 92–96. However, five years later, after considering the conclusions of the Bryan Panel Report, the Standards Council announced its intention in 2000 to withdraw 780 unless proponents could provide "adequate substantiation" of its scientific validity. Exh. 43 to DSOF, at 24.

Thereafter, proponents of 780 submitted at least two documents in support of the scientific basis of NFPA 780: a report by a Federal Interagency Lightning Protection User Group (the "Interagency Report") and a report by the Committee on Atmospheric and Space Electricity of the American Geophysical Union ("AGU Report"). On October 4, 2001, the NFPA issued a decision to retain NFPA 780, concluding that the Interagency Report "provides the minimum independent literature review and analysis that the Council was soliciting ..." Exh. 53 to DSOF, at 1–

2. In that decision, the Standards Council extensively discussed the relationship between NFPA 780 and 781, the scientific basis of ESE technology, and the Heary Brothers' challenge to 780:

The opponents of NFPA 780, and in particular the representative of the Heary Brothers ... have made a multitude of arguments attacking the reports, the ethics and the bias of the authors [of the Interagency Report], and the soundness of their conclusions.... The Council has reviewed all of these arguments [and found them unpersuasive].... The Hearys have explicitly tied their newfound opposition to NFPA 780 to the asserted unequal treatment accorded to ESE technology within the NFPA system....

Suffice it to say there has been no disparate treatment of ESE. The Council is well aware of its obligation to ensure that new products, services, or methods receive a fair hearing within the NFPA codes and standards development system. It is for this reason that the Council has given the subject of ESE lightning protection lengthy and, indeed, unprecedented consideration, even after the proposed standard for ESE failed to receive the support of the NFPA codes and standard development process.... The Council voted to decline to issue a standard for ESE lightning protection systems because it failed to receive the support of the NFPA codes and standards development system, and because, apart from the doubts about the technology that were reflected in that failure, two separate independent reviews of the technology, by the [NIST] and by the Bryan Panel, concluded that the claims of vastly superior performance of ESE terminals over conventional terminals simply had not been validated.

In contrast, the Council has voted to continue its project on conventional

lightning protection systems because NFPA 780 has repeatedly, unfailingly, and overwhelmingly received the support of the NFPA codes and standards development process.... No reasonable or credible arguments have been made to undermine these [independent reports and analyses] or to cause the Council to question the conclusions of the scientists, engineers and safety experts who authored them. There has been no disparate treatment.

Exh. 53 to DSOF, at 6–9. On May 8, 2002, the Appeals Subcommittee of the NFPA Board of Directors upheld the Standards Council decision. Exh. 54 to DSOF.

## II. PLAINTIFFS' SHERMAN ACT CLAIM

### A. Legal Standard

To establish a claim under Section 1 of the Sherman Act, Plaintiffs must show three elements: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition." *Les Shockley Racing, Inc., v. National Hot Rod Ass'n,* 884 F.2d 504, 507 (9th Cir.1989) (quoting *Oltz v. St. Peter's Comm. Hosp.,* 861 F.2d 1440, 1445 (9th Cir.1988)). The fact-finder must then apply a "rule of reason" analysis to determine if a challenged restraint is "unreasonable," meaning that "the factfinder must weigh the anticompetitive effects and the procompetitive effects or business justifications advanced for the challenged restraint..." *Id.* at 507. "Although antitrust cases are sometimes difficult to resolve on summary judgment because of their factual complexity, summary judgment is still appropriate in certain cases." *County of*

*Tuolumne v. Sonora Community Hosp.,* 236 F.3d 1148, 1154 (9th Cir.2001).

■ The legal framework for this case begins with *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), a case which also involved manipulation of the standard-setting process of the NFPA. In *Allied Tube,* the original plaintiff, a seller of a new type of electrical conduit, initiated a proposal for certification by the NFPA of its type of electrical conduit to meet NFPA standards. The proposal was scheduled for a floor vote at the NFPA's annual meeting. At that vote, the original defendant and other interests conspired to pack the meeting vote by, among other activities, recruiting 230 members to join the organization and paying their membership and travel expenses to attend the meeting solely to defeat the proposal. The proposal was defeated by four votes. *Id.* at 496–7, 108 S.Ct. 1931. At trial, the jury awarded damages for antitrust liability, and the case was appealed on the basis of whether the competitors had so-called *Noerr* immunity because the NFPA was akin to a legislative body.[1] The Supreme Court, disclaiming that "we do not here set forth the rules of antitrust liability governing the standard-setting process," held that the defendants had no immunity from antitrust liability "flowing from the effect the standard has of its own force in the marketplace." *Allied Tube,* 486 U.S. at 509–10, 108 S.Ct. 1931. The Supreme Court did not grant certiorari on the question of whether the defendant's actions were actually illegal under the Sherman Act. *Id.* at 499, n. 3, 108 S.Ct. 1931.

The Supreme Court in *Allied Tube* acknowledged that courts have applied a rule

---

1. Under *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (*Noerr*), and its successive cases, concerted efforts to restrain trade by petitioning government officials and bodies are immune from antitrust liability.

of reason analysis to the activities of *private* standard-setting organizations. "When ... private associations promulgate safety standards based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling competition, those private standards can have significant procompetitive advantages. It is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations." *Allied Tube*, 486 U.S. at 501, 108 S.Ct. 1931. For this reason, more extensively discussed in the Court's July 1998 Order [Doc. # 135], the Court held that if Plaintiff could show that "Defendants conspired to prevent the issuance of an NFPA safety standard for ESE systems," then "it is possible that Plaintiffs [would] be able to prove the existence of an implicit agreement to enforce the status quo," thereby stating a claim under the Sherman Act. *See* Order [Doc. # 135] at 11–12.

Defendants are only liable for *unreasonable* activities that cause antitrust activities, and the rule of reason has a particular application in standard-setting cases. In *Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478 (1st Cir.1988), the First Circuit provided the framework for finding liability in an almost analogous case. In *Clamp–All*, the plaintiff alleged that its competitors, the defendants, had prevented a standard-setting organization from adopting a standard that would have benefitted the plaintiff. The First Circuit, in an opinion written by then Judge Breyer, held that "we do not see how plaintiff could succeed on its antitrust claim unless (at a minimum) [defendants] *both* prevented [the standard-setting organization] from adopting a national performance standard that would have benefitted [plaintiff] *and* did so through the use of unfair, or improper practices or procedures." *Id.* at

488 (emphasis in original). Only improper manipulation of the standard-setting process constitutes an unreasonable restraint of trade. Therefore, in order to determine liability, the Court must determine whether Defendant's actions were "improper," then determine whether a fact-finder could find that improper actions actually caused the alleged injury to competition.

■ However, the Court must recognize that mere speech on behalf of or against a proposed standard cannot be held to be improper and unreasonable. *Clamp–All*, 851 F.2d at 488. As *Clamp–All* acknowledged, it is reasonable for groups to express their views and lobby on behalf of standards that benefit themselves. "Certifiers may reasonably believe that they can do their job properly (a job that benefits consumers) only if all interested parties are allowed to present proposals, frankly present their views, and vote." *Id.* at 488. Different courts have taken different positions on whether speech that is merely false or misleading may constitute "improper" or unreasonable conduct that can form the basis of antitrust liability.

For example, in *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir.1989), the Seventh Circuit considered a case where the speech of a trade association criticizing a certain procedure as "experimental" was challenged as an unreasonable restraint of trade. The Court held that expression of an opinion, without a tangible ability to enforce conformity to its recommendations, does not unreasonably restrain trade. "If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas." *Id.* at 400.

Although the Court in *Schachar* analyzed the effect of an organization's speech on the market, in this case, the

effect of the speech is even more attenuated; Defendants' speech could serve only to persuade or dissuade other members of the NFPA. The counter to Defendants' allegedly false and misleading speech is more speech, a response in which Plaintiffs concede they have vigorously engaged. Further courts have indicated that lies or misrepresentations may be sufficiently improper as to constitute a subversion of the standard-setting process.

> Merely to say that [quality] standards are disputable or have some market effects has not generally been enough to condemn them as 'unreasonable' under the Sherman Act.... [S]omething else or more extreme is generally present in the cases that have condemned quality standards as anticompetitive. In such cases, the principal concern has been the use of standards setting as a predatory device by some competitors to injure others; normally there is a showing that *the standard was deliberately distorted by competitors of the injured party,* sometimes through lies, bribes, or other improper forms of influence, in addition to a further showing of market foreclosure.

*DM Research, Inc. v. College of Amer. Pathologists,* 170 F.3d 53, 57 (1st Cir.1999) (emphasis added). *See also Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 523 (5th Cir.1999) ("in the municipal bidding context, permissible competition is not restricted to the bid itself but can also occur in the process of 'selling' specifications and contract forms, when companies 'tout the virtues' of their product").

■ After a showing of improper means, Plaintiffs must show that Defendants' improper actions were the but-for cause of the antitrust injury. *See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 401 (7th Cir.1993) (In establishing antitrust injury, courts must first delineate types of interest protected by antitrust laws and, second, must determine whether violation was cause-in-fact of injury—but for violation, injury would not have occurred); *Chelson v. Oregonian Publ'g Co.,* 715 F.2d 1368, 1371 (9th Cir.1983) (If news dealers can show that they and newspaper publisher and would have reached an agreement "but for the actions" of a competing publisher, the dealers have established antitrust injury.). In this case, Defendants must show that Plaintiffs' improper actions actually caused the NFPA to decide to reject NFPA 781. In *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 17 F.3d 295 (9th Cir.1994), the Ninth Circuit analyzed a similar case also with an intervening cause. In *Sessions,* the plaintiff petitioned a government agency to set a standard that would injure its competitor in the market. The Ninth Circuit found that the defendant was shielded by *Noerr* petitioning immunity because the damages were the result of government action. *Id.* at 299–300. Although *Noerr* immunity is not relevant in this case, the Court's analysis of the causation involving a third-party standard-setting actor is highly instructive.[2] To hold the defendant liable for injuries flowing from intervening government action (assuming no *Noerr* immunity), the Court held that "we would have to find that the restraint was imposed *because of* [defendant's] petitioning efforts. Proof of causation would entail deconstructing the decision-making process to ascertain what factors prompted the various governmental bodies to erect the anticompetitive barriers at issue." *Id.* at 300

---

2. In arguing that *Sessions* is inapplicable, *see* Sherman Act Resp. Memo. at 32–34, Plaintiffs focus erroneously on the parts of the decision that do not involve causation, namely the discussion of *Noerr* immunity and the question of antitrust injury. They fail to refute Defendants' interpretation of the causation analysis and fail to offer competing case law.

(emphasis in original). Similarly, to find liability for Defendants' actions lobbying the NFPA, a fact-finder must be able to conclude that the alleged restraint imposed by the third party, the NFPA, was imposed *because of* the improper lobbying efforts of Defendant. Further, the Ninth Circuit suggests that such proof must entail "deconstructing the decision-making process." *Id.*

Other Ninth Circuit precedent also imports a but-for causation test for antitrust liability. In *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir.1979), the Ninth Circuit held that, "[a]ccording to *Brunswick [Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)], plaintiff must show more than that it suffered injury causally linked to the antitrust violation; the injury must be shown to have 'flowed' from the wrong.... To be one of several causes is not enough." Noting that the lower court gave a "proximate cause" or "substantial part" instruction on causation, the Court stated that it is "left in doubt whether the *Brunswick* test has been met" and reversed for error. *Id.* at 997; *see Brunswick*, 429 U.S. at 489, 97 S.Ct. 690 (holding that antitrust plaintiffs "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which defendants' acts unlawful").[3] *See also Microbix Biosystems, Inc. v. BioWhittaker, Inc.*, 184 F.Supp.2d 434, 437 (D.Md.2000) ("[I]n the antitrust context ... Plaintiff has the burden of proving that the alleged illegal conduct was a substantial or materially contributing factor in its injury.... [E]vidence that is merely speculative will not satisfy this burden.").

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Jesinger*, 24 F.3d at 1130. In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322;, 106 S.Ct. 2548 *see Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Furthermore, the party opposing summary judgment "may not rest upon the

---

**3.** Plaintiffs contend that *Handgards* is inapplicable because it was a case brought under § 2 of the Sherman Act, not § 1. However, the discussion in *Handgards* about antitrust injury is in general terms, as evidenced by the fact that *Brunswick*, the case upon which it relies, was an antitrust action brought under the Clayton Act. Moreover, Plaintiffs fail to identify a single Ninth Circuit decision discussing causation under § 1, or any alternative controlling case law upon which the Court should rely.

mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir.1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *see also* Rule 1.10(*l*)(1), Rules of Practice of the United States District Court for the District of Arizona ("Any party opposing a motion for summary judgment must ... set[ ] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. However, because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge, ... [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995).

**B. But-for Causation**

On the issue of causation, Defendants have filed Motion for Summary Judgment: Lack of Proof of Causation [Doc. # 316]. Plaintiffs, in their Sherman Act Response Memorandum [Doc. # 309], describe the "gravaman" [sic] of their complaint as "the Defendants' abuse of the standard-setting process resulted in a lack of 'consensus' for proposed NFPA 781 at the 1993 Phoenix meeting and thereafter manipulated the NFPA standard-setting process to maintain a 'consensus' for the retention of NFPA 780." *Id.* at 17. Plaintiffs thus have two theories of causation: (1) that Defendants' actions at the 1993 NFPA meetings directly caused a lack of consensus for 781, leading to the rejection of NFPA 781, and (2) Defendants manipulated this consensus to improperly convince the NFPA to retain NFPA 780. On this latter point, the Plaintiffs argue that "[b]ased on this 'lack' of consensus for NFPA 781 and the 'consensus' for NFPA 780 ... the NFPA thereafter imposed a greater standard of scientific and technical validity on ESE systems than was applied in deciding to retain NFPA 780, resulting in the anti-trust injury, whereby there is only one nationally recognized standard for lightning protection." *Id.*[4]

Under the framework of *Clamp–All* and *Sessions*, the Plaintiffs must show both that Defendants' actions in regards to the NFPA's standards-setting process were improper, and that the NFPA failed to issue 781 (or failed to repeal 780) *because of* Defendants' *improper* actions. *Clamp–All*, 851 F.2d at 488; *Sessions*, 17 F.3d at

**4.** Although the NFPA's rejection of the proposed 781 standard and retention of NFPA 780 are related, Plaintiffs admitted at the hearing that the mere retention of 780 (despite the Plaintiffs' efforts to have it withdrawn) does not giver rise to an antitrust claim. In particular, Plaintiffs provide no evidence of injury or damages flowing from the NFPA's decision not to withdraw 780. To do so, Plaintiffs would have to present evidence of a but-for market where there were *no* NFPA standards at all. As discussed in Part C, concerning Mr. Guth's expert report, Mr. Guth performed no such calculations, and Plaintiffs present no such evidence.

300. The analysis of Plaintiffs' claim begins with whether Defendants' actions in November 1993 were improper, and whether they were the but-for cause of the NFPA's decision.

### (1) Were Defendants' Actions Improper?

Plaintiffs identify two sets of allegedly improper actions taken by Defendants at the 1993 NFPA meeting. First, Plaintiffs criticize the distribution of handouts before the general membership vote. Plaintiffs argue that the distribution of handouts was itself improper, and that the statements contained in the handouts were false or misleading. Second, Plaintiffs claim that various statements made by Defendants and their allies on the floor of the membership debate were false or misleading.

### (a) Handouts

Plaintiffs initially contend that the distribution of handouts at the 1993 meeting was itself improper and greatly injured the consensus standard-setting process. They base their allegation on an NFPA Guideline (admittedly adopted after 1993) that the standard-setting process be "open, fair, and honest to all participants." Exh. 31 to PSOF, at 11. It is unclear from the record evidence whether the distribution of handouts at the general membership meeting was against NFPA regulations. Plaintiffs assert, however, that this fact is irrelevant because the NFPA later changed its rules in response to the handout incident. Plaintiffs rely on *Allied Tube*, which noted that "[t]he antitrust validity of these [allegedly illegal] efforts is not established, without more, by petitioner's literal compliance with the rules of the Association, for the hope of procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competi-

tion." *Allied Tube*, 486 U.S. at 509, 108 S.Ct. 1931. In *Allied Tube*, liability was supported by the fact that the NFPA changed its rules in response to the defendant's actions, and the NFPA officially found that the defendant had "circumvented" NFPA rules. *See Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 947 (2d Cir.1987), *aff'd, Allied Tube*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497.

Here, Plaintiffs provide some evidence that the handout distribution might have been improper. Arthur Cote, testifying on behalf of the NFPA, testified that "we, has [sic] a general rule, do not allow handout materials in the actual area where the meeting—where the votes are going to be taken." Cote Dep. at 89–90, Exh. 34 to PSOF. Further, Cote described the prohibition as "a blanket prohibition regardless of content," and stated that "NFPA has taken the position that we do not believe the process is enhanced by having additional materials presented for the membership at the time the committee reports are being debated." *Id.* at 92. However, another witness, John Bryan, testified that the distribution of handouts was not against NFPA rules "at that time," but that "after that incident, the Standards Council or somebody made a ruling that they could distribute materials outside the technical session room but not within the room." Bryan Dep. at 183–4, Exh. 32 to PSOF. Finally, Defendants admit that Ackerman was told by someone at the NFPA to stop distributing the handouts but nevertheless continued to distribute them.

 Still, the evidence is not adequately persuasive that the handout distribution was sufficiently improper to support antitrust liability. Under NFPA rules in force in November 2001, materials distributed *inside the meeting room* must have prior

approval by the Secretary of the Standards Council, and only NFPA members can distribute them. Exh. 35 to PSOF.[5] There appears to be no regulation of distribution outside the meeting room or in advance of the meeting. Cote's testimony on behalf of the NFPA does not indicate that handouts are an inherent threat to the process, only that they are procedurally disfavored by the NFPA. *Cf. Indian Head,* 817 F.2d at 947 (liability found where defendant "violated the integrity of the NFPA's procedures" and "subverted the code making process"). Further, though the NFPA later changed the rules regarding handouts, they have also, as discussed in the next section, continued to assert that the membership vote was fairly conducted despite the handouts. The conclusion that the handout prohibition is primarily procedural is reinforced by the fact Defendants were free to *inform* members all of the information contained in the handouts. Certainly, the distribution of handouts does not, on its face, contravene the vague NFPA Guideline that the process be "open, fair, and honest to all participants." Exh. 31 to PSOF, at 11. Ultimately, there is insufficient evidence that distribution of handouts, standing alone, so undermines the fairness of a standard-setting process such that it can form the basis for antitrust liability.[6]

Aside from the bare complaint that Defendants distributed the handouts,

Plaintiffs contend that the information contained in the handouts was false and misleading. In their Sherman Act Response Memorandum [Doc. # 309], Plaintiffs identify a range of statements that they claim are misleading.

First, one handout contained the statement that "the NFPA Standards Council is so concerned about the makeup of this [781] Committee that they have commissioned an investigation." Exh. 67 to PSOF. This statement is misleading because East Coast and Thompson challenged the balance of the makeup of the 781 Committee membership shortly before the November 1993 membership meeting, and the Standards Council was required to conduct an investigation regardless of the merits of the complaint. *See* Exh. 47 to PSOF at 5–6, 44 (Standards Council minutes of 10/14/93), Cote Dep. at 125. It appears that the membership of the 781 Committee was available in March 1993 and Defendants waited until October to register a challenge with the Standards Council. *See* Exh. 10 to DSOF (proposed Technical Committee Report listing members); Exh. 48 to PSOF (Larsen note dated 3/23/93 to Rison enclosing report). Therefore, the assertion that the Standards Council was concerned about the makeup of the committee and conducting an investigation was misleading, and mis-

---

**5.** The date at which the NFPA Technical Meeting Convention Rules, attached as Exh. 35 to PSOF, were passed is unclear from the document and related testimony. Also, Defendants have moved to strike PSOF ¶ 71, 72, and 154 regarding the prohibition on handouts. The Court has relied on the underlying testimony rather than Plaintiffs' characterization in their SOF.

**6.** Plaintiffs are correct that *ex post* approval by a standards-setting organization does not provide conclusive evidence of propriety of a member's anticompetitive actions. *See Amer-*

*ican Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (liability found even where standards-setting organization decided that all members had acted properly). *Hydrolevel,* however, is not exactly analogous, because it involved a case where a member's actions were vicariously imputed to the organization itself, such that the organization was essentially conducting an investigation into the propriety of *its own* conduct. The NFPA's investigation here was an investigation into whether third parties violated NFPA procedures.

represented both the NFPA process and Defendants' role therein.

Next, the handouts state that "Document 781 contains nearly 50 new or changed paragraphs that have not been subjected to public review," even though O'Connor (a 781 Committee member) testified at the October Standards Council meeting, at which Defendants' representatives were present, that the changes were primarily the result of printing errors. Exh. 67 to PSOF; Exh. 47 to PSOF at 37–8, 42–3. This statement, while literally true, was potentially misleading.

Next, the handouts indicated that the "American scientific community" opposed NFPA 781, yet only five scientists submitted official comments, and almost 80% of the scientific comments were submitted from two individuals, Dr. William Rison ("Rison") and Prof. Charles Moore ("Moore"), the latter of whom had comments reviewed by LPI before submission. Dr. Rison and Prof. Moore are both researchers at the Langmuir Laboratories at New Mexico Institute of Mining and Technology ("New Mexico Tech"), that has received funding from Defendants to conduct research on lightning protections systems. Plaintiffs argue that Defendants should have disclosed that Rison and Moore had received research funding from Defendants, that Moore had his comments reviewed by LPI, and/or that New Mexico Tech received funding from Thompson for additional lightning research approximately six weeks after Moore submitted his comments.[7] PSOF ¶¶ 105–116, 122–3, 164. However, Plaintiffs point to no require-ment that Defendants affirmatively disclose any potential conflicts of interest of the scientists who made comments. Further, Plaintiffs had the opportunity to rebut the comments by showing a conflict of interest, and, in fact, Moore and Rison's comments were distributed along with the 781 Committee report, *in advance* of the vote. Even if Defendants' claims of the "American scientific community" were exaggerated (and Plaintiffs have not conclusively shown or established an issue of fact that they are), both Plaintiffs and the NFPA members knew of the comments of the scientists in advance of the meeting.

Next, the handout claims that an ESE terminal failed testing conducted at New Mexico Tech, and "[l]ightning struck within the claimed protected area." Exh. 67 to PSOF. Plaintiffs argue that the handout failed to discuss the financial backing for the test, which was provided by Defendants, in furtherance of earlier litigation. PSOF ¶¶ 43, 175. Further, Plaintiffs dispute, for a variety of reasons, whether the tests were accurately conducted. PSOF ¶ 46. However, as Defendants point out in their motion to strike ¶ 46, Rison did not concede that he thought the experiment was flawed. Rison testified that he did not follow two instructions for installation, but he also thought the ESE terminals were "sufficiently grounded" to conduct testing. Rison Dep. at 23–24, Exh. 25 to PSOF. Plaintiffs present no evidence that Defendants were under an obligation to state the potential criticisms of the test, or whether or not they themselves commissioned the

---

7. Defendants have moved to strike some of the Statement of Facts in support of these allegations. PSOF ¶ 107, claiming that Heary Bros. was not informed of LPI's comment solicitation efforts, is unsupported by the evidence and will be stricken. Larsen testified only that he personally never informed Kenneth Heary of the solicitation. PSOF ¶ 108, claiming that LPI solicited *negative* com-ments, is a speculative characterization of what occurred and will be stricken. Though a jury could infer that LPI desired negative comments, there is no admissible record evidence that they specifically sought them out. PSOF ¶ 117, describing Thompson's funding to New Mexico Tech, will not be stricken because it is supported by the record. *See* Steffes 6/2/93 letter, Exh. 58 to PSOF.

experiments. Plaintiffs were free to dispute the results of the test themselves. However, one handout comment indicating that "data about field tests were not presented to the Committee" may be .false or misleading, because Plaintiffs claim, without dispute, that the 781 Committee did review the results of the New Mexico Tech test. PSOF ¶¶ 96–7.

■ Finally, Plaintiffs point out a number of statements in the handouts that are inconsistent with positions that many of the Defendants have taken at other times. These statements are not actually false or misleading; Defendants cannot be held liable for an antitrust violation for making *inconsistent* arguments unless there is proof that they intentionally did so. First, the handout says that the 781 Committee is "grossly out of balance" and provides a chart purporting to link the members together and expose their affiliations. Plaintiffs claim that East Coast should have disclosed that LPI encourages its own members to participate on the NFPA 780 Technical Committee to further their economic interests, and that LPI allegedly has control of the 780 Committee. PSOF ¶¶ 172–3.[8] Defendants' position is not misleading, even if they pursue similar strategies themselves in other contexts.

Second, one handout criticizes the 781 Committee balance because the scientists on the Committee had backing from the lightning protection industry. However, East Coast has also taken the position, albeit in a letter written seven years later, that it is unrealistic to expect scientists on Technical Committees to operate independently of corporate sponsorship. Exh. 68 to PSOF. Again, this might be an inconsis-

tent argument on East Coast's part, but the statements about the affiliations of the scientists are not false or misleading.

Third, one handout claims that ESE proponents "do not have a right to use a NFPA document as a marketing tool," though East Coast and Thompson arguably do use the NFPA standard as a marketing tool. Exh. 67, 72, 73 to PSOF. This statement is not even inaccurate, since East Coast and Thompson do not claim a "right" to use NFPA approval as a marketing tool, even if they avail themselves of the opportunity.

In sum, Plaintiff can identify, at most, three statements contained in the handouts that were potentially false or misleading, such that they might be "improper."

**(b) Statements made on the floor at the meeting**

Plaintiffs also contend that some of the statements made during the debate were false and misleading. Many of these statements overlap with the allegedly false and misleading statements identified by the Plaintiffs in the handout.

Plaintiffs object to Rison's testimony about the New Mexico Tech lab results at the floor debate. Rison actually testified at the hearing that the New Mexico Tech tests "were conducted, one, by a law firm with regard to litigation. Another was requested by one of the opponents." Exh. 77 to PSOF at 35–36. However, Plaintiffs object to his statement that experimental ESE device had been installed as recommended by the manufacturer, though he admitted in his deposition that he made two modifications to the installation. Exh.

---

8. Defendants have moved to strike PSOF ¶ 27, which is the evidence supporting the allegation that LPI encourages its members to participate on the 780 Committee. This statement will be stricken, because the only evidence in the record is a fax from Thompson to LPI enclosing a draft letter, upon which the statement is based. Plaintiffs have not proven that the letter was sent, and there is no evidence upon which a jury may reasonably infer such a fact.

77 to PSOF at 36; Rison Dep. at 23–24. The statement is arguably misleading. Plaintiffs' other complaint is that Rison's testimony was inconsistent with other opinions he has taken at later times regarding testing of lightning protection systems. PSOF ¶ 201. Again, arguably inconsistent positions taken a number of years apart are not analogous to false or misleading statements.[9]

Next, Plaintiffs complain that Ackerman claimed that the 781 standard was opposed by "the U.S. scientific community" and that the "Standards Council has established a task force to investigate the make-up of the committee." Exh. 77 to PSOF at 21, 22. As discussed above, the first claim is an exaggeration at best for Plaintiffs' proof. The second claim, as phrased by Ackerman at the meeting, is not actually false, though it may be misleading.

Finally, Plaintiffs point to statements by Al Steffes claiming that an ESE system installed at the Dolphin Hotel had failed, allegedly resulting in lightning striking the tail of a 60–foot–tall dolphin icon mounted on the building. Plaintiffs claim that Steffes was making misrepresentations, because Steffes had been present at the deposition of a representative of the building owner, James Nagy, who indicated that the owners originally filed a claim for lightning damage, but then did not challenge the determination of Heary Bros. and its "investigator," Alex Chaberski ("Chaberski"), that the damage was due to an unexpected methane gas buildup.

Nagy Dep. at 20–27, Exh. 79 to PSOF.[10] Notwithstanding this testimony, Steffes had an adequate basis to support his thesis. As for personal knowledge, he stated that "I have been in the lightning business since the early 1970s and I know what lightning damage is. I viewed the Dolphin Icon. The structure was clearly struck with lightning...." Steffes Aff. ¶ 12 [Doc. # 239]. Moreover, Chaberski later testified that he conducted no investigation of the dolphin icon, evaluated no physical evidence, and based his opinion entirely on Edwin Heary telling him (inaccurately) that there was no lightning storm when the dolphin exploded. Chaberski Dep. at 113–120, Exh. 1 to Steffes Aff. Thus, Steffes's statements at the November meeting were, at best for Plaintiffs' proof debatable, and not false or misleading.

Even the misleading statements made during the floor debate do not necessarily constitute "improper" actions, because Plaintiffs had a full opportunity to rebut the allegations of the handouts and the arguments made during the floor debate at the time of the floor debate. Enigmatically, Plaintiffs, in fact, chose to remain silent throughout most of the proceedings. Rapp did speak in support of NFPA 781, and various other Heary Brothers participants testified that no one would have stopped them from speaking out at the meeting. *See* K. Heary Dep. at 475, Exh. 8 to DSOF. Though Plaintiffs now contend that the NFPA influenced their decision not to address the handouts explicitly,

---

9. The Court notes that Rison is not a named Defendant or a paid expert for any Defendant, although his attendance at the NFPA meeting was financed by Defendants. It is therefore unclear whether Defendants may be held liable for his statements. The Court need not resolve that question, because, as discussed below, the sum total of alleged improprieties in insufficient to support a finding of causation.

10. Defendants have moved to strike PSOF ¶ 205 because it is a deposition taken from prior litigation. However, Steffes himself was present at the deposition, taken on behalf of LPI, and he offered part of the transcript as an exhibit to his Affidavit. Therefore, under Fed.R.Civ.P. 32(a)(4), other parts of the deposition should be considered "in fairness." What is more, it is admissible as not hearsay because it was not offered to prove the truth of the matter asserted. Fed.R.Evid. 801.

Plaintiffs' evidence, at most, indicates that some of the 781 Committee members made a strategic decision not to address the handouts at the meeting. McAfee, the acting chair of the 781 Committee testified that he met with a number of NFPA representatives, but also testified that they gave him no instructions regarding what 781 Committee members should or should not say during the floor debate. *See* McAfee Dep. at 157–8, 221, Exh. 12 to DSOF.

Frederick Heary and Rapp, through their affidavits, have contradicted McAfee's testimony and insisted that they relied on assurances by the NFPA that the handouts would be investigated and remedial action would be taken. Defendants have moved to strike this evidence as hearsay. Rapp's testimony, in ¶ 41 of his affidavit, is based on hearsay from unattributed sources. Rapp claims that the 781 Committee "was told that the NFPA was concerned..." and "NFPA representatives advised the 781 Technical Committee members that ..." This evidence is admissible not for the truth, but only as evidence of Rapp's state of mind concerning why he did not respond to the handouts at the meeting, not that the NFPA was actually concerned or actually planning to investigate the handout. Similarly, Frederick Heary's affidavit, specifically ¶ 53, relies on McAfee's statements about what McAfee was told by the NFPA, adding a second layer of inadmissible hearsay. Finally, a memo that McAfee later wrote describing the discussions with the NFPA, Exh. 75 to PSOF, is hearsay because offered for the truth, and is not admissible, as Plaintiffs contend, as a past recollection recorded, because McAfee testified in his deposition without the need to refresh his mind as to

a present recollection of the NFPA meeting events. *See* Fed.R.Evid. 803(5) (hearsay admissible of "record concerning a matter which about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately"). McAfee's testimony shows that the NFPA made no affirmative assurances or instructions to prevent the 781 Committee members from speaking at the floor debate.[11] Indeed, all the evidence indicates that the silence of the Committee members was a strategic decision. PSOF ¶ 187.

Having narrowed down the list of arguably improper conduct from Plaintiffs' extensive litany of allegations, the Court must determine if any genuine issues of material fact exist to support a finding of but-for causation.

**(2) Were the allegedly improper acts the but-for cause of the failure to adopt NFPA 781?**

█ Plaintiffs have two critical links which they must make in order to prove but-for causation. First, they must show that Defendants' actions at the November 1993 meetings actually changed the outcome of the membership vote. Second, they must show that the 1993 membership vote was the but-for cause of the Standards Council's decision to not issue NFPA 781. Plaintiffs must show both of these links to establish causation. The Court concludes that Plaintiffs can not establish either.

**(a) Evidence from the November 1993 meeting**

Plaintiffs are without admissible evidence that the handouts or allegedly

---

11. Even if Plaintiffs could show that the NFPA had somehow discouraged or prevented Plaintiffs from presenting their case to the membership, that fact would not necessarily show liability on the part of Defendants, since it would only show that the NFPA, which is *not* a Defendant, intervened to alter the outcome of the floor vote.

misleading arguments made at the membership meeting actually caused the membership to vote to send the 781 report back to the Technical Committee. As previously noted, William Heary conceded that the vote was "overwhelming." W. Heary Dep. at 86, Exh. 13 to DSOF. The evidence that the flyers actually changed the outcome of the vote rests on pure speculation. For example, the extent of Edwin Heary's "proof" that Defendants influenced the outcome was "*it seems to me* they were successful in getting the people to vote it down; the firemen." E. Heary Dep. at 91, Exh. 14 to DSOF (emphasis added). He conceded that he knew of no member who changed his or her vote because of the handout. *Id.* at 99, 109–110. William Heary also testified that he knew of no member whose vote was changed, and that "there was a large firemen's contingency there, and they all wanted to move on to their business, and so they all voted in pretty much a block...." W. Heary Dep. at 87. Rapp testified that he talked to between three and ten members of the membership audience, but did not relate what any of them told him. Rapp Dep. at 87, Exh. 9 to DSOF. In Plaintiff's Statement of Facts, they do not point to a bit of evidence suggesting that the membership vote was changed because of the Defendants' handouts and statements. *See* PSOF ¶¶ 208–209 (describing, without elaboration, movement of members in and out of meeting room).

The extent of Plaintiffs' argument is such: "Plaintiffs do not need to reconstruct the NFPA membership vote in Phoenix. A reasonable jury could find that the Defendants' conduct was a substantial or [a] materially contributing factor to the NFPA membership's vote based on the conduct of Defendants before the vote occurred." Plaintiff's Resp. Memo. [Doc. # 309] at 66. Plaintiffs offer no case law to support the argument that a jury could infer causation from improper conduct alone, nor was the Court able to find any. For one, there is no record evidence of any causative effect at all, merely speculation by the Plaintiffs. Second, there are many other possible contributing factors, including the recorded objections to the 781 Committee report, as well as the lobbying and arguments made by Defendants before the vote that were not "improper." Indeed, the crux of Defendants' arguments against 781 is that the ESE technology simply does not work as claimed, an argument that even Plaintiffs do not dispute as "improper." In short, Plaintiffs have no evidence that the allegedly improper acts influenced the vote *at all*, much less evidence to support that Defendants' acts were the but-for cause of the vote.

Notably, *Allied Tube* provides no support for Plaintiffs' argument regarding causation, because in that case causation was not at issue. In *Allied Tube*, the lower court found conclusively that the membership-packing had led the outcome of the vote. In that case, the defendant had packed an NFPA meeting with around 230 members whose sole purpose was to defeat the proposed standard, and the standard failed by only four votes. *Allied Tube*, 486 U.S. at 496–7, 108 S.Ct. 1931. Furthermore, at the time of the *Allied Tube* vote, the NFPA membership vote would have resulted in the adoption of the standard, *see Allied Tube*, 486 U.S. at 496, 108 S.Ct. 1931, whereas approval by the membership of NFPA 781 in 1993 would have only sent the report to the Standards Council for further review. In *Allied Tube*, the critical causation links that Plaintiffs must prove were not at issue.

As a final argument against Defendants' summary judgment motion on causation, Plaintiffs argue that Defendants' causation argument "essentially asks for antitrust immunity regardless of what misrepresen-

tations they might make before an NFPA membership vote." Plaintiff's Resp. Memo. [Doc. # 309] at 66, n.21. In making this argument, Plaintiffs confuse an element of their cause of action with a potential affirmative defense. Plaintiffs bear the burden of showing that the alleged misrepresentations actually caused the change in the vote because *causation is always an element of the antitrust claim.* If Defendants prevail on the causation issue, it is not because they are "immune" from antitrust liability, but because Plaintiffs fail to meet their burden. Simply put, not every false statement made during a floor debate on a standard can form the basis of a Sherman Act claim; Plaintiffs' obligations are the same as all litigants; they must show that the statements *actually caused* an antitrust injury. There is no such proof in this case.

### (b) Subsequent NFPA actions rejecting 781

Even if the Plaintiffs could show that Defendants' improper conduct caused the outcome of the membership vote, they cannot show that the vote was the but-for cause of the Standards Council's decision not to issue 781. As previously noted, a membership vote approving the Report in 1993 would only have had the effect of sending the 781 standard to the Standards Council, which makes the final decision. The Standards Council has repeatedly based its decision not to issue NFPA 781 on the lack of scientific consensus that ESE technology works at all.

Plaintiffs contend that the lack of "consensus" surrounding NFPA 781 was based on Defendants' improper actions at the 1993 meeting. In its 1994 decision regarding complaints about the 1993 meeting, the Standards Council concluded that "the overwhelming vote of the membership recommending the return of the document for further study indicates that the consensus necessary to issue the document has not

yet been achieved." Exh. 17 to PSOF. However, the Standards Council traced this lack of consensus to *legitimate* questions about the scientific underpinnings of ESE technology. "The Council further believes, based on its review of the entire record, that despite the sometimes contentious nature of the debate, the lack of consensus derives from genuine and legitimate questions on whether the early streamer emission technology has been adequately demonstrated to be effective." *Id.* Therefore, the Standards Council concluded that the necessary consensus was not achieved because of legitimate scientific arguments that, under any interpretation, Defendants and other opponents of ESE technology were allowed to make without running afoul of antitrust liability. In fact, Arthur Cote, the Secretary of the Standards Council, testified that the 1993 membership vote had no bearing on the conclusions reached by the Standards Council not to issue the 781 standard. Cote Dep. at 193–4, Exh. 20 to DSOF.

Further, after the 1994 decision, the NFPA commissioned the independent NIST Report, which was authored by Dr. Van Brunt. He also found a lack of scientific evidence that ESE terminals are more effective than conventional terminals. At a Standards Council hearing in 1995, Plaintiffs again had an opportunity to address the issues of scientific proof. The Standards Council again decided, in its 1995 decision, not to issue the 781 standard based on a lack of scientific or technical proof. After the NFPA reached a settlement in this lawsuit and examined the independent Bryan Report, the NFPA again declined to issue 781. In its most recent 2001 decision, the NFPA clarified that "[t]he Council voted to decline to issue a standard for ESE lightning protection systems because it failed to receive the support of the NFPA codes and standards development system, and because, *apart*

*from the doubts about the technology that were reflected in that failure,* two separate independent reviews of the technology, by the [NIST] and by the Bryan Panel, concluded that the claims of vastly superior performance of ESE terminals over conventional terminals simply had not been validated." Exh. 53 to DSOF, at 9 (emphasis added).

This evidence shows that there are simply too many intervening causes to the Plaintiffs' alleged antitrust injury. The NFPA has repeatedly decided, based on independent reports of lack of scientific proof, to not issue 781, and Defendants are not responsible for the NFPA's actions. Plaintiffs' responsive argument is that the NFPA claims to rely on "consensus" in making its decisions, and Defendants allegedly destroyed a "consensus" at the 1993 membership vote. Plaintiffs' argument fails because they use the term "consensus" too broadly. Plaintiffs must show that the NFPA relied up on the "consensus" *of the membership vote* in order to show causation, even though the NFPA claims that it relied on the consensus of scientific community (i.e., through the availability of scientific proof).

In response to the NFPA's defense of its 781 decision, Plaintiffs argue that the NFPA is being inconsistent: it either over-reached in demanding scientific proof for 781 because NFPA 780 specifically disclaims that the NFPA "does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in its codes or standards," Exh. 11 to PSOF, or misapplied its *own* standard for consensus standard-setting in failing to repeal 780 for lack of scientific proof. This argument does not save Plaintiffs' claims. Whether the NFPA misapplied its own standards is not relevant to a claim against *Defendants;* if anything, it shows that the NFPA, not

Defendants, was the cause of the alleged antitrust injury.

Finally, Plaintiffs' argument that the NFPA is applying its own standards incorrectly is not an issue for the Court to decide. The Court cannot infer that the NFPA (and then, by some extension, the Defendants) are the cause of an antitrust injury by evaluating the substantive outcome of a standard-making decision. "Neither anticompetitive animus nor the other elements of a section 1 claim can be inferred solely from the incorrectness of a single business decision by a standard-setting trade association.... An individual business decision that is negligent or based on insufficient facts or illogical conclusions is not a sound basis for antitrust liability." *Consolidated Metal Products, Inc. v. American Petroleum Inst.,* 846 F.2d 284, 297 (5th Cir.1988). As the Fifth Circuit emphasized, federal courts must not "become boards of automatic review for trade association standards committees," which would "tax the abilities of the federal courts... [and] discourage the establishment of useful industry standards." *Id.* at 297. Further, "it is not antitrust's mission to correct standards that are substantively wrong or even irrational, but only to seek out injuries to competition." 13 Areeda & Hovenkamp, *Antitrust Law* § 2232d, at 361 (1999). *See also Schachar,* 870 F.2d at 400 (role of Sherman Act is not to evaluate the merits of an organization's conclusion, just whether it had anticompetitive effect); 13 Areeda & Hovenkamp, *Antitrust Law* § 2232a, at 354 (1999) ("To the extent possible, antitrust must evaluate standard setting without asking the litigation fact finder to determine such questions as ... whether a certain product is dangerous or defective.").

### (3) Plaintiffs' other assorted allegations of impropriety

Plaintiffs also offer a laundry list of allegedly improper acts on the part of

Defendants over the course of a decade. Most of these are not relevant because Plaintiffs make no real attempt to link the activities to any facet of the NFPA's decision-making. Without a showing of causation, many of Defendants' activities can be summarized and dismissed.

The Plaintiffs specify a number of actions taken by Defendants before the November 1993 meeting that they consider "improper." *See* Plaintiffs' Response Memo at 46–7. However, Plaintiffs do not allege that any of these acts changed the outcome of the membership vote. Plaintiffs claim that Ed Lobnitz, a member of the 781 Committee, failed to disclose his affiliation with LPI before serving on the Committee. This allegation is irrelevant because the 781 Committee succeeded in submitting the 781 report over the dissenting vote of Lobnitz, thus neutralizing any effect he could have on the outcome. Plaintiffs claim that Defendants reviewed and edited comments from Moore before submitting them to the members. This allegation is addressed in the handouts discussion above. Finally, Plaintiffs argue that the challenge to committee balance made in October was "unusual" in its timing. Shannon Dep. at 45, Exh. 33 to PSOF. However, Plaintiffs' actions to attempt to block the 781 report in October were neither against NFPA policy, nor successful. Plaintiffs' litany of alleged improprieties only highlights how little any of them support a finding of causation.

Plaintiffs also argue that Defendants made a number of misrepresentations when submitting the results of the New Mexico Tech to the NIST. *See* Sherman Act Response Memo. at 48–50. The most serious allegations are that Defendants did not disclose that Ackerman and Moore discussed funding for the New Mexico Tech research at the same time Moore was testifying before the NFPA, and that Steffes convinced Moore to delete statements crit-

ical of conventional lightning protection systems from his report. There is no evidence that the New Mexico Tech submissions, much less the improper conduct, caused Dr. Van Brunt to alter his conclusions. The NIST contained a bibliography of 302 documents upon which Dr. Van Brunt relied. Exh. 28 to DSOF. Moreover, Dr. Van Brunt examined the New Mexico Tech tests specifically and questioned the reliability of tests conducted at that altitude. *Id.* at 21. Rapp, in his deposition, admitted that Dr. Van Brunt discounted, at least to some extent, the reliability of those tests. Rapp. Dep. at 154–156. Thus, Plaintiffs have failed to show a causal link.

Plaintiff's final set of alleged improprieties deals with Rison's conduct in preparing the AGU Report in the most recent (2000–1) round of hearings on NFPA 780. Not only are the alleged improprieties minimal in effect, but the Standards Council indicated that it relied upon the separate, independent Interagency Report in making its determination not to withdraw 780. Exh. 53 to DSOF, at 1–2 (explaining that the Interagency Report "alone" provides sufficient evidence to maintain NFPA 780). Again, Plaintiffs make no real attempt to show causation for these assorted allegations of impropriety.

### C. Antitrust Injury / Daubert Motion to Exclude Expert Testimony of Guth

■ Defendants have also filed two motions contesting whether Plaintiffs can establish proof of antitrust damages: Motion for Summary Judgment: Plaintiffs Cannot Establish Damages [Doc. # 249], and Defendant's *Daubert* Motion to Exclude Testimony Offered by Louis Guth [Doc. # 251]. The two motions are interrelated because Plaintiffs rely entirely on Mr. Guth's expert report to establish damages,

and Plaintiffs bear the burden of showing an actual injury to competition. *Les Shockley*, 884 F.2d at 507. Exclusion of Mr. Guth's testimony leaves the Plaintiffs with no proof on injury, an essential element of their Sherman Act claim. The Court will grant both motions which, as with the Court's decision on causation, is dispositive of this litigation.

### (1) Overview of Mr. Guth's Report

In his report, Mr. Guth initially concluded that the relevant product market is the national market for lightning protections systems ("LPS"), excluding labor associated with installation. Guth Expert Report (November 16, 1998) at 6 ("Guth Report"). Using Heary Bros.'s bids from October 1994 until the time of his report, he compared the ratio of bid price for a Faraday system to bid price for an ESE system for all projects in which Heary Bros. made a bid for both systems for the same project, including installation costs. He concluded that the overall price of ESE systems, including installation, is usually a fraction of Faraday systems in most instances, excepting the smallest projects. *Id.* at 8. However, the majority of installed systems remain Faraday systems, reflecting buyers' uncertainty about the performance of ESE systems and the decision to use Faraday systems because they conformed to NFPA standards. *Id.* at 9.

Mr. Guth concluded that if an NFPA standard had issued for the ESE system, there would have been an (1) increase in the selection of ESE systems, (2) increase in the price of ESE systems, and (3) increase in the number of firms offering ESE systems. *Id.* He reasoned that a calculation of lost profits is the appropriate measure of economic damages necessary to put Plaintiffs in a position economically equivalent to where they would have been had the NFPA issued 781. *Id.*

To estimate lost profits, Mr. Guth first estimated the total "but for" sales of ESE systems. during the calculation period. *Id.* He believed that the increase in "but for" sales of ESE systems would commence at the beginning of 1994 and persist through 1998. *Id.* To arrive at an estimate of the total market share consisting of ESE systems, he analyzed Heary Bros.'s bidding data where the company bid on both an ESE system and a Faraday system for the same project by sorting this data by overall costs of an LPS, including materials and installation. *Id.* at 17. This resulted in 60% (by dollar value) of the projects having less cost using ESE as opposed to Faraday technology. *Id.* Therefore, he concluded that over time ESE systems would account for 60% of the total LPS business. *Id.* at 17–18.

Next, Mr. Guth estimated the total market share of ESE systems for each year from 1994 through 1998. To obtain these figures, he used a lognormal cumulative distribution function for the market share of ESE systems, with a long-run maximum figure of 60%. *Id.* at 18. These share figures were used (presumably in conjunction with the U.S. Government Census of Manufacturers data) to calculate total market revenues for ESE system materials only for each year. *Id.* Next, he made an upward adjustment to reflect the higher materials-only cost of ESE systems to account for consumers switching their choices from Faraday to ESE systems. *Id.* This resulted in materials-only revenues for the total "but for" sales of ESE terminals to be $9.7 million in 1994 and growing to approximately $40 million by 1997. *Id.*

Next, Mr. Guth estimated the share of the "but for" revenues from the total sales of ESE terminals going to Heary Bros. and NLPC. *Id.* First, he assumed that the two Plaintiffs were initially the only sellers

of ESE systems and relied upon their actual shares of ESE sales during the damage period. *Id.* Second, to account for new market entrants, he assumed market entry would begin in 1995 and the aggregate of the new entrants' market share would steadily increase until equal to that of NLPC in 1998. *Id.* at 19. To estimate market shares for each year of the damage period belonging to Heary Bros., NLPC, and the aggregate of new entrants, he used the Cournot model of competition. *Id.* In the initial year of the damage period, he assumed that Heary Bros. held 80% of the market while NLPC held 20%. *Id.* By using the Cournot model, Mr. Guth calculated market shares for each of the Plaintiffs and the aggregate of new entrants for each year of the damage period. (*Id.*) The Cournot calculation resulted in "but for" 1998 market share estimates of approximately 43% for Heary Bros., 28.5% for NLPC, and 28.5% for the aggregate of new entrants. *Id.*

Finally, Mr. Guth calculated Plaintiffs' lost profits from the estimate of projected market share. He offset Plaintiffs' lost profits resulting from the decrease in sales of Plaintiffs' Faraday systems in the "but for" world. *Id.* After making this offset adjustment, the final "but for" revenue estimate for Heary Bros. ranged from $15.4 million in 1994 to $16.7 million in 1998. *Id.* at 20. The final "but for" revenue estimate for NLPC ranged from $2.4 million in 1994 to $12.9 million in 1998. *Id.* To convert lost revenues to lost profits, Mr. Guth used the actual profit margins of

Heary Bros. in each year of the damage period and applied these figures to both Heary Bros. and NLPC. *Id.* at 20. This resulted in lost profits of $14,861,568 and $7,214,992 for Heary Bros. and NLPC, respectively. *Id.* After further adjustment for lost profits from a failed draft agreement with Home Depot, Mr. Guth added the estimated present values of the Home Depot agreement to Heary Bros.'s lost profits, arriving at a total damage estimate for Heary Bros. ranging from $17,840,748 to $18,486,361. *Id.* at 21.[12]

### (2) Legal Framework of Expert Testimony

Federal Rule of Evidence 702 governs expert testimony. This rule provides:

if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court adopted a standard for judges to apply Rule 702 of the Federal Rules of Evidence to screen expert scientific testimony. Em-

---

**12.** Heary Bros. claimed lost profits from a failed agreement with Home Depot to supply residential and small business kits for installing ESE systems. *Id.* at 20. In 1994, while NFPA was being evaluated, Heary Bros. negotiated with Home Depot a draft contract to supply these kits. *Id.* According to this document, Heary Bros. would supply Home Depot with 5000 kits during the second quarter of 1995 at a unit price of $400. *Id.* Mr. Guth

estimated that at Heary Bros.'s average profit margin of 18%, Heary Bros. would have made a profit of approximately $360,000. *Id.* at 21. However, because 781 was not issued, the agreement was not implemented. *Id.* To analyze damages, Mr. Guth estimated the present value of the Home Depot agreement opportunity beginning in 1995, producing estimates ranging from $2,979,180 to $3,624,793. (*Id.*)

phasizing the role of judges as the gatekeepers of evidence, the Court stated that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. The proposed expert testimony "must be supported by appropriate validation-*i.e.*, 'good grounds,' based on what is known." *Id.* at 590, 113 S.Ct. 2786. The Court explained that the trial judges must determine reliability by engaging in a "preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. The Court provided factors that might be relevant to the inquiry, including "whether it can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," and the "degree of acceptance within [a relevant scientific] community." *Id.* at 593–94, 113 S.Ct. 2786. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."[13] *Id.* at 595, 113 S.Ct. 2786. Nonetheless, the Court emphasized that "[t]he inquiry envisioned by Rule 702 is ... a flexible one," and the Court did "not presume to set out a definitive checklist or test." *Id.* at 593–94, 113 S.Ct. 2786.

Furthermore, the Court found that "rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 593, 113 S.Ct. 2786. Whether the testimony presented by the expert is "sufficiently tied to the facts of the case ... has aptly been described ... as one of 'fit.'" *Id.* at 591, 113 S.Ct. 2786. However, "[s]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

In the Court's subsequent decision of *Kumho Tire Co. v. Carmichael,* the Supreme Court clarified that the trial courts' gatekeeping function is not limited to 'scientific' expert testimony, but rather applies to all expert testimony. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court stated that there is not a clear line dividing "scientific" knowledge, "technical" knowledge, or "other specialized knowledge," and the *Daubert* factors may or may not apply depending on the facts of each case:

> The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert,* nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular issue.

*Id.* at 148, 119 S.Ct. 1167. The objective of the inquiry is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. Thus, *Kumho Tire* emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function.

---

13. The Supreme Court blurred the lines between methodology and conclusion in *Gen. Elec. Co. v. Joiner* by stating that "conclusions and methodology are not entirely distinct from one another.... A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Generally, antitrust damages cannot be measured with absolute accuracy. In *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931), the Court noted that "[t]he rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." The Court emphasized:

> [I]t would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Id.* at 563, 51 S.Ct. 248. Therefore, the Court must distinguish between damage calculations that rely on impermissible speculation and those that rely upon permissible inferences. *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). "[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on the relevant data, and render its judgment accordingly." *Id.* at 264, 66 S.Ct. 574.

**(3) Mr. Guth's testimony will be excluded.**

■ Defendants challenge the admissibility of Mr. Guth's testimony under FRE 702 on a number of grounds. The Court finds two of the challenges persuasive. .

**(a) Mr. Guth assumed that Plaintiffs were the only sellers of ESE in 1993**

Defendants argue that Plaintiffs' damage estimate is incorrect because Mr. Guth's calculations include only two sellers (Plaintiffs Heary/LPA and NLPC) of ESE systems in 1993 in his expert analysis. In his analysis, Mr. Guth assumed that the sellers existing in 1993 would retain the entire ESE market share following the passage of 781 and continuing until 1995, when other companies would enter the market. Defendants argue that there were numerous sellers of ESE technology in 1993. Defendants' primary evidence is a 1993 letter dated January 18, 1993 written by Ed Heary specifying a number of other U.S. sellers of ESE terminals. Exh. 4 to Def.'s *Daubert* Motion [Doc. # 251]. The letter names eight manufacturers and twenty-four sellers of ESE systems in the United States, and notes that "[i]n the last few years the number of dealers in the United States who distribute the various types of early streamer emission air terminals which are equivalent to the product of [LPA] has grown by leaps and bounds." *Id.* Further, the intent of the letter is clearly to *refute* a claim that LPA would be the only competitive bidder to a project specifying ESE systems.

In Response, Plaintiffs argue that Defendants must come forward with evidence that some other company had a share of the ESE market in 1993. Plaintiffs offer the affidavit of Mr. Guth, who states that he saw no information of material sales of ESE systems by any other of the listed companies in the relevant market during the time of his analysis. Guth. Aff. [Doc. # 308] ¶ 26. He indicates that he could "easily accommodate this information into [the] analysis if it were provided." *Id.*

Plaintiffs further argue that the 1993 letter does not prove that any other market participant could compete on a significant or substantial level in 1993. During the hearing, Plaintiffs referred to the ESE capacity of other manufacturers and distributors in 1993 as "de minimis."

Plaintiffs' response is insufficient to substantiate Mr. Guth's conclusions. First, Mr. Guth never indicated that he *concluded* that there were no other significant market participants in 1993. He was simply not presented with any information (by Plaintiffs) that there were other market participants in 1993. Second, Plaintiffs, not Defendants, bear the burden of showing that the evidence is admissible and showing the measure of antitrust damages. Here, Defendants are the only parties presenting any proof, in the form of a letter essentially written by Plaintiffs. Third, the context of the 1993 letter contradicts Plaintiffs' assertion, ten years later, that the competitive power of other market participants was de minimus in 1993. As is apparent from reading the letter, not only does Ed Heary name eight manufacturers and twenty-four distributors by name, the point that Ed Heary makes in the letter is that LPA would face considerable competition from other ESE market participants if ESE terminals were specified in design specifications.

Here, the problem is that there is *no* evidence *at all* supporting Mr. Guth's assumption that there were no other serious market competitors in 1993. All damage estimates must be "based on sufficient facts or data." Fed.R.Evid. 702. "The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by evidence." Fed.R.Evid. 702 Advisory Committee's note (2000). However, the *only* evidence in the record is the 1993 letter which explicitly contradicts Mr. Guth's assumption that there were only two U.S. manufacturers in the market in 1993. Mr. Guth is permitted to make reasonable assumptions in his analysis, but the assumption about market participants in 1993 is unreasonable given that the only record evidence directly contradicts the assumption. This assumption is critical to Mr. Guth's analysis because he relied on the state of the 1993 market to calculate Plaintiffs' "but for" market share of ESE systems through 1998. The failure of the initial market share assumption renders the rest of the calculations unreliable.

Plaintiffs' final argument is that Plaintiffs' initial market share is a factual issue to be left to a jury. However, not only does the Court have an obligation to exercise its "gatekeeping" responsibilities to ensure reliability under *Daubert,* there is no conflicting evidence for a jury to consider, and no reasonable jury could find that Mr. Guth's assumptions were supported by reliable evidence.

### (b) **Mr. Guth misapplied the Cournot Model**

Defendants argue that Mr. Guth's economic model—the Cournot model [14]—does not "fit" the reality of the LPS market, and that Mr. Guth did not apply the methodology of the model consistently.[15] Un-

---

**14.** The Court recognizes that Mr. Guth disclaims following a particular "model," maintaining that he merely used "a relationship from the Cournot model." Guth Aff. ¶¶ 21, 23. As explained below, Mr. Guth did not use a unitary economic model for every facet of his damages calculation. The Court's use of the term "Cournot model" recognizes that Mr. Guth did not use a unitary model, but

that, as he admits, he used the economic relationship that forms the foundation of the Cournot model in performing one aspect of his calculations.

**15.** In support of their motion, Defendants submit the Affidavit of James R. Kearl, an expert economist. Exh. 1 to *Daubert* Motion. The Court's explanation in informed by Mr.

der the Cournot model, for a specific market, any individual firm's market share is completely determined by that firm's marginal cost of production. The Cournot model assumes that each firm competes by taking into account the expected output of a small number of rivals; that is, each firm's competitive strategy is based on what it believes will be the production decisions of its rivals. Once all firms have made mutually consistent production decisions, the market demand determines the market price. Each firm's market share is determined by the elasticity of market demand and the firm's marginal production costs. Therefore, if one firm has lower marginal costs than its rivals, the Cournot model predicts that it will have a higher market share. For example, in a market where firms have the same marginal costs, the firms will divide the market equally. Conversely, if firms have different relative shares of the market, then they must have different marginal costs.

Mr. Guth's assumptions, however, do not fit the Cournot model. Mr. Guth uses the Cournot model to estimate the Plaintiffs' "but for" market share in each successive year after NFPA 781 would have been adopted. Mr. Guth assumes that in 1994 Heary Bros. had 80% of the ESE market while NLPC had 20%. If the Cournot model was applicable to this market, the model should predict that NLPC had much higher costs. However, Mr. Guth also assumes that NLPC and Heary Bros. had the same profit margin in his analysis. Since both firms face the same market price, and since profit margin is price minus costs, if NLPC and Heary Bros. have the same profit margin, then they must have the *same costs*. But under the Cournot model, two firms with the same costs must have the same market share. This contradiction continues throughout the subsequent years of Mr. Guth's damage

analysis, because he maintains the assumption that Heary Bros. and NLPC have the same profit margin, but in each of these years the two continue to have different market shares. If the Cournot model applies to the ESE market, then these firms cannot have the same profit margin, sell in the same market, and have different market shares.

In addition, Defendants argue that the Cournot model does not fit the LPS market because the Cournot model assumes that firms choose the production quantity and then take whatever market price results. Therefore, if firms compete on *price*, the Cournot model does not apply. It is undisputed that LPS firms compete on the price, not quantity, because they compete by price bidding. The firms do not decide how many LPS systems to produce and then take whatever price the market will bear. Rather, LPS firms typically compete for specific jobs by submitting price bids—and thus the Cournot model does not fit the economic reality.

In response, Plaintiffs argue that Mr. Guth only used the Cournot model for a limited purpose. In his affidavit, Mr. Guth indicates that he did not use the Cournot Model either to analyze the competitive effect of standard-setting or to calculate Plaintiffs' lost sales. Guth Aff. ¶ 4. Rather, he used the Cournot Model to reduce the amount of Plaintiffs' damages to reflect the projection that new participants would enter the market once an ESE standard was adopted. *Id.* In other words, Mr. Guth used the Cournot model only when calculating how much to *reduce* Plaintiffs' damage estimate to reflect new market entrants. Id. ¶ 23.

The Court recognizes the Cournot model was employed only for a limited purpose in the damages calculation. However, an es-

Kearl's analysis in addition to the parties' and

Mr. Guth's arguments and analysis.

timation of how new market participants would affect Plaintiffs' profits is integral to the calculation. Plaintiffs point out that Defendants have no alternative model, and argue that Mr. Guth's use of the Cournot model is at least an approximation of how new market entrants would affect Plaintiffs' profits in a "but for" world. Plaintiffs' argument is unavailing. If Mr. Guth had performed *no* calculation discounting market share by new market entrants, Mr. Guth's entire expert report would be excluded as unreliable. The fact that Mr. Guth used an economic model to reduce the amount of damages that admittedly did not *fit* the LPS market does not make the report any *more* reliable.[16] On the contrary, Plaintiffs are left without a reliable methodology for calculating damages that is consistent with the economic market. A flaw in this one aspect of the expert report renders the testimony and report useless to assist the a jury in calculating damages with any degree of accuracy. Mr. Guth's report will be excluded, and the motion for summary judgment granted.

### D. Defendants' Additional Motions Regarding Sherman Act Claim

Defendants have filed two additional summary judgment motions, Motion for Summary Judgment: No Anti–Competitive Effect / No Antitrust Injury [Doc. # 232], and Motion for Summary Judgment: No Conspiracy [Doc. # 247]. In their Reply [Doc. # 318], Defendants seem to abandon their conspiracy arguments. Nevertheless, the Court need not consider these motions in light of its decision to grant summary judgment for Defendants on the Sherman Act claim. The motions will be denied as moot.

### III. EAST COAST'S LANHAM ACT COUNTERCLAIM AGAINST PLAINTIFFS

#### A. Legal Standard and Description of Challenged Advertisements

East Coast has filed an Amended Counterclaim [Doc. # 172] against Plaintiffs alleging false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). East Coast must prove five elements to prevail on a § 43(a) claim: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement...." *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir. 1997). Further, "[t]o demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland,* 108 F.3d at 1139. In this case, East Coast is asserting that Plaintiffs' advertising claims are literally false.

■ East Coast has abandoned may of its original allegations of false advertising in its Counterclaim. In their summary judgment motion, Plaintiffs argue that many of East Coast's allegations do not concern literal falsity, and are merely mis-

---

**16.** At the hearing, Plaintiffs also advanced the argument that the difference between the Heary and NLPC market share can be explained by production capacity. Plaintiffs cite footnote 34 of the original report, but that footnote does not mention capacity. Indeed,

the Court cannot identify any portion of Mr. Guth's report or affidavit where he explains how capacity would affect the economic model, which, as discussed above, considers only a limited number of variables.

leading advertising. Without a showing of literal falsity, East Coast bears the burden of providing evidence of some consumer confusion in order to prevail on false or misleading advertising claim. *Southland,* 108 F.3d at 1140; *see also U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1040 (9th Cir.1986) ("[P]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance."). East Coast has not presented any evidence of actual consumer confusion, and thus cannot state a claim for literally true but misleading advertising. Further, East Coast has neither responded to Plaintiffs' argument nor opted to argue its claims against Plaintiffs are not based on literal falsity. Therefore, summary judgment will be granted against East Coast's allegations in its Counterclaim that: (1) Plaintiff advertised independent testing of their products in a misleading fashion (Counterclaim ¶ 22(b)); (2) Plaintiffs' advertising relies on a misleading "International Standard" (Counterclaim ¶ 22(c)); (3) Plaintiffs offer financial guarantees that are misleading and they cannot honor (Counterclaim ¶ 22(d)); (4) Plaintiffs make false statements about East Coast's products (Counterclaim ¶ 22(f)); (5) Plaintiffs promulgate project specifications which are misleading for reasons related to the above allegations (Counterclaim ¶ 23).

East Coast argues that two particular claims constitute literal false advertising: Plaintiffs' claims that ESE devices provide a specific and measurable zone of protection, and the claims that ESE systems can protect against lightning strikes in open spaces. These two claims are interrelated, because Plaintiffs claim they can protect from lightning strikes in open spaces *because* the zone of protection extends to cover those spaces. East Coast submits evidence of a number of advertisements for Heary/LPA's Preventor and NLPC's Prevectron. Heary/LPA's advertisements include a variety of claims about a measur-

able zone of protection, such as: "Our most recent development, PREVENTOR SYSTEM 2005, is an efficient mast-type system, which creates an impenetrable capture zone with a range of 100 meters," Exh. F to East Coast's SSOF [Doc. # 244]; a diagram showing the Preventor 2005 protecting a ground area with a radius of 328 feet, Exh. V to EC SSOF; "The protection zone of each Preventor unit (as laboratory tested by Inchcape) is a radius of 50 meters, if installed on highest projection of the structure," Exh. W to EC SSOF; "One Lightning Preventor protects up to 450,000 sq. ft.," Exh. Y to EC SSOF. One brochure also includes this information:

Q. Is the Preventor air terminal tested to document that the zone of protection is valid?

A: Preventor air terminals have been performance tested in ETL/Inchcape Laboratories high voltage lightning test cell documenting the time of the upward early streamer emission validating $\Delta L$, and certifying the area of the zone of protection the Preventor air terminal provides.

Exh. V to EC SSOF. Also, some Heary/LPA materials indicate that the Preventor "provides lightning protection for open areas and structures," and specifically mentions lightning protection for "athletic fields." Exh. F to EC SSOF. Finally, East Coast presents one advertisement for NLPC's Prevectron which specifies a "minimum radius of protection" for systems mounted at different heights, such as 52 feet for a "Prevectron 6" mounted at a height of 5 feet. Exh. X to EC SSOF.

East Coast contends that these advertisements are literally false because they rely on testing which East Coast claims is scientifically groundless. Under Ninth Circuit precedent, East Coast may prove literal falsity by showing that the underly-

ing tests are unreliable. "To prove that an advertisement claim based on product testing is literally false, 'a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive.' Rather, the plaintiff must demonstrate that the tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." *Southland,* 108 F.3d at 1139 (quoting *McNeil–P.C.C., Inc. v. Bristol– Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991)). The plaintiff (here, the counterclaimant East Coast) bears the burden of showing that the tests are unreliable. However, "[a] plaintiff may meet this burden either by attacking the validity of the defendant's tests directly or by showing that the defendant's tests are contradicted or unsupported by other scientific tests." *Southland,* 108 F.3d at 1139.

### B. East Coast's Evidence of Unreliability

East Coast relies primarily on the expert report of Dr. Martin Uman, attached as Exh. T to EC SSOF. Dr. Uman concludes that, in his opinion, "based on over 35 years experience in lightning, laboratory spark, and gaseous electronics research, there is no basis for the claim that systems using so-called 'early streamer emission' (ESE) air terminals provide superior lightning protection to the protection provided by a standard Franklin rod system as described in NFPA 780...." *Id.* at 1. Dr. Uman's report indicates that he examined the underlying ESE theory, field studies, laboratory studies, and academic literature in preparation of the report. Dr. Uman believes that "[c]laims for the superiority of ESE devices are based on questionable theory, inconclusive laboratory experiments that are questionably extrapolated to natural lightning, and two inconclusive experiments on triggered lightning." *Id.* at 1. Further, Dr. Uman believes that the weight of opinion within the scientific com-

munity is against proponents of ESE systems, nothing that "[t]he ESE theory is rejected by the majority of scientists in the field of lightning physics and protection; three recent papers in peer-reviewed scientific journals by internationally acknowledged experts severely criticize the ESE approach; and the claims and experiments of ESE proponents have not been presented by them for rigorous peer review in appropriate scientific journals." *Id.* Finally, he indicates that "the use of ESE devices, in configurations that do not conform to NFPA 780, can be dangerous. For example, the use of ESE rods based on claims of relatively-long collection distances to protect the recreationists in a large outdoor area invites the death of the recreationists if the ESE claims of protected area are not valid." *Id.* at 7.

Plaintiffs do not criticize the qualifications of Dr. Uman as an expert witness in the relevant area of expertise under Fed. R.Evid. 702; they criticize his opinion. First, Plaintiffs contend that Dr. Uman's expert report is inconsistent with the lack of reported failures of ESE terminals in the field. Dr. Uman has testified that lightning protection systems do work in the field despite lack of understanding of a theory of "zones of protection." In his deposition, Dr. Uman stated that, "I do believe, you know, that the cone protection is not a well—theoretically well-justified concept, but it works in practice, it has worked for a long time...." Uman Dep. at 193, Exh. 71 to PSOF. Dr. Uman's statements, made in the context of discussing an article, are not clarified, and it is unclear what exactly "works in practice." However, this criticism of Dr. Uman's report is misleading. East Coast is not claiming that Plaintiffs' advertising is false because the advertising claims that ESE devices work in general; rather, East Coast is claiming that the advertising is false because it promises a measurable zone of protection, greater than conven-

tional rods, and that it can function effectively to protect open spaces. Dr. Uman's deposition comments do not contradict those conclusions.

Plaintiffs also criticize Dr. Uman for not applying his theory to the physics behind conventional air terminals. Dr. Uman's report, however, does not purport to explain or justify the physics behind conventional terminals. Rather, he concludes that ESE terminals provide no measurable advantage over conventional terminals, much less a particularly enhanced zone of protection, and therefore, that *installation* of ESE terminals in a configuration not compliance with NFPA 780 could be dangerous. Dr. Uman concedes that ESE terminals work as well as conventional lightning rods, but argues that ESE systems, which rely on calculations of an enhanced zone of protection, are dangerous because they require fewer air terminals.

 Nevertheless, Plaintiffs contend that Dr. Uman and the Court must consider the "current state of the testing art," and examine the reliability of testing of conventional air systems to establish a baseline standard for testing of ESE systems. Pl's Reply [Doc. # 295], at 17. This argument is unsupported by *any* citation to case law in the Plaintiff's motion papers. The test of literal falsity under *Southland* is whether Plaintiffs' testing is *objectively* unreliable, not whether it is more or less reliable than the testing of its competitors. The Court is not confronted with the entire state of advertising for the lightning protection industry, and can only rule whether the ads at issue are literally false.

As a final matter, Plaintiffs' criticisms of Dr. Uman's report and opinions as not sufficient under *Daubert* scrutiny are not

sufficient to prevent summary judgment against them. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. Instead, the non-moving party must go beyond the pleadings and by its own evidence 'set forth specific facts showing that there is a genuine issue for trial.'" *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (quoting Fed.R.Civ.P. 56(e)). Therefore, Plaintiffs must provide some evidence of reliability to create a genuine issue of material fact.

## C. Plaintiffs' Evidence of Reliability

As an initial matter, much of Plaintiffs' claims of proof are misdirected, because Plaintiffs continue to overstate the extent of East Coast's claim. East Coast's claim is merely that current scientific evidence and testing does not support that ESE terminals provide a measurable zone of protection above the range of conventional terminals, much less "an impenetrable capture zone with a range of 100 meters." Exh. F to EC SSOF. To support this thesis, East Coast presents the expert testimony of Dr. Uman. Nevertheless, Plaintiffs continually attempt to mischaracterize East Coast's Lanham Act claims, particularly in their affidavits. For example, Frederick Heary "testified" in his July 2002 Affidavit that, "[t]he only basis for East Coast's claim that these advertisements are misleading is the fact that the NFPA had decided not to adopt a standard for ESE systems." Heary July Aff. ¶ 7 [Doc. # 235]. East Coast has moved to strike this and other such statements as calling for a legal conclusion, and the Court will strike such statements because conclusions of law are for the Court to determine and therefore inadmissible.[17]

---

17. Specifically, the Court will strike the following paragraphs of Mr. Heary's July Affidavit, insofar as they profess a legal conclusion: ¶¶ 4–6; ¶ 7; first sentence of ¶ 8; ¶ 9; first sentence of ¶ 31; ¶ 32; ¶ 35. Plaintiffs contend that Mr. Heary may profess his "under-

See McHugh v. United Serv., Auto. Ass'n, 164 F.3d 451, 454 (9th Cir.1999) (witness testimony only relevant for facts, and not legal conclusions); Hygh v. Jacobs, 961 F.2d 359 (2d Cir.1992) (opinions on legal conclusions not helpful to trier of fact and should be excluded).

Plaintiffs offer a variety of evidence to attempt to create a genuine issue of material fact regarding whether the underlying tests are "sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." Southland, 108 F.3d at 1139. To support the reliability of testing, Plaintiffs offer the lay opinion testimony of Frederick Heary and Robert Rapp, the evidence of the testing itself, the products' conformance with foreign standards, the support of academic literature, evidence of success in the field, and recent specifications by the United States Army. The Court concludes that none of the evidence is admissible to support the validity of Plaintiffs advertisements. In particular, most of the evidence relies on scientific evidence or conclusions that must be supported by expert testimony or admissible lay opinion testimony.

*Lay Opinion Testimony of Frederick Heary and Robert Rapp*

Both Frederick Heary and Robert Rapp submit affidavits which include conclusions about whether their products provide a measurable zone of protection. Their testimony is not offered under Fed.R.Evid. 702, governing expert testimony, and therefore their opinions must be admissible as lay witnesses under Fed.R.Evid. 701. To support the admissibility of Heary's and Rapp's testimony, Plaintiffs cite a line of cases allowing corporate officers to testify about their personal knowledge of their company and industry. For example, in In re Kaypro, 218 F.3d 1070, 1074–75 (9th Cir.2000), the Ninth Circuit

held that a declarant's five years of experience as a credit manager adequately supported his personal knowledge of "industry practice." See also Allied Systems, Ltd. v. Teamsters Auto. Transp., Chauffeurs, Demonstrators & Helpers, Local 604, 304 F.3d 785, 792 (8th Cir.2002) (particularized knowledge gained by position in business is admissible under Rule 701). Further, "[t]hat Rule 56(e)'s requirements of personal knowledge and competence to testify have been met may be inferred from the affidavits themselves." Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir.1990) (per curiam ).

Frederick Heary does not have the specialized knowledge to testify about the physics of lightning protection systems. He indicates that he has "more than 30 years experience in the lightning protection industry," Heary Oct. Aff. ¶ 2, and has "gained personal knowledge regarding industry practices, including personal knowledge regarding various standards that exist within the industry." Heary Supp. Aff. ¶ 6. However, he concedes that he has no formal education beyond high school. Plaintiffs persistently contend that Heary's personal knowledge of industry practice is sufficient for him to testify regarding scientific or technical matters. However, Plaintiffs confuse the personal knowledge requirement in Rule 602 with Rule 701's limitation on the types of specialized admissible opinion testimony. Mr. Heary might have personal knowledge of some of the facts that underlie the scientific or technical judgments, such as the procedures for the installation of lightning protection devices, but he does not have the specialized knowledge or expertise to testify about the abstract physics of a "zone of protection." And even if he did have such knowledge, his opinions must be admissible under Rule 702 by an assessment of Daubert scrutiny. Likewise, Rapp bases

standing" of East Coast's allegations and legal arguments.

his testimony only on "over 25 years of experience in the lightning protection industry." Rapp Supp. Aff. ¶ 1.

█ Many of Mr. Heary's opinions will be stricken for failure to establish the expertise necessary to testify as a lay opinion witness. The following portions of Mr. Heary's October Affidavit will be stricken: the technical descriptions of functions of ESE terminals in the first three sentences of ¶ 8; conclusory assertions of the success of ESE terminals in the last sentence of ¶ 11, in ¶ 14 ("based on the success…"), and in ¶ 23 ("ESE terminals offer a larger area of protection"); and Mr. Heary's understanding of the technical findings by the 781 Technical Committee (which are also excluded as inadmissible hearsay) in ¶¶ 42, 44, 45, the portions of ¶¶ 56 and 57 that rely on the 781 technical findings, and ¶ 104. As for ¶¶ 100–111, the portions which merely describe the Heary Bros. catalog and advertisements are admissible because Mr. Heary has personal knowledge of the contents of these materials. The portions which purport to explain the scientific or technical foundation of the calculations for the zone of protection will be stricken: ¶¶ 103, 106, 107, 108 (which is also multiple hearsay), 109, and 111. Likewise, the following portions of Mr. Rapp's Affidavit will be stricken: ¶ 16 as it relates to "the expanded coverage of the air terminals," ¶¶ 31 and 32, which also include hearsay as to the beliefs and thought processes of the 781 Technical Committee, and the last sentence of ¶ 52 (which is also based on hearsay).

*Proof of testing*

█ Plaintiffs argue that the fact that their ESE products have been tested to meet particular standards is proof of their effectiveness. In particular, Heary/LPA relies on its products' compliance under testing conducted by ITS laboratories. *See also* Rapp Aff at ¶¶ 59–61 (describing testing for NLPC). However, the tests only provide data; they do not prove the validity of the formula to estimate a zone of protection. In fact, Dr. Uman's argument is that the testing is meaningless, because the underlying calculation used to measure a zone of protection is flawed. Therefore, even if Plaintiffs' products did perform under the ITS tests, the tests do not prove a particular zone of protection unless Plaintiffs can independently show that their formula is valid. " '[I]f the plaintiff can show that the tests, *even if reliable,* do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden' of demonstrating literal falsity." *Southland,* 108 F.3d at 1139 (quoting *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 63 (2d Cir.1992)) (emphasis added). In fact, representatives of ITS have disclaimed that ITS only tests products in relation to independently drafted standards and does not vouch for the standards themselves, and have also specifically disclaimed the Heary Bros. formula for calculating a zone of protection. *See* 9/22/98 Letter of Robert Fiske, 2/28/01 Letter of David Feeney, Exh. L, M to EC SSOF.[18]

---

18. The Fiske letter states that "[i]t is important to note that ITS does not draft standards nor does it guarantee safely of products. ITS only evaluates products according to established standards that were developed for purposes of safety." Exh. L to EC SSOF. The Feeney letter indicates that "the tests performed by ITS, pursuant to the draft NFPA 781 standard (now withdrawn) *do not* confirm Heary Bros.' claims of a 'zone of protection…' Since Heary Bros.' mathematical formula has not been accepted or adopted by a national standards organization such as the NFPA, ITS *did not* and *cannot* certify or confirm Heary Bros.' 'zone of protection' claims." Exh. N to EC SSOF (emphasis in original). Plaintiffs point out that the second letter is directed at an independent lightning protection distributor, not Heary/LPA, but that objection is not relevant to evaluating ETS' opinion regarding its testing results,

*Compliance with foreign standards*

Plaintiffs also argue that the fact that their products conform to a number of foreign standards is proof that the products can provide a measurable zone of protection. However, Plaintiffs provide no admissible evidence that conformance to any foreign standard provides a scientific basis for their claims. For example, Mr. Heary testified in his July 2002 Affidavit that "the standard-setting bodies in several countries ... have found the scientific evidence supporting ESE systems to be sufficient to adopt nationally-recognized standards for ESE systems." Heary July Aff. ¶ 9. East Coast has moved to strike this statement because Mr. Heary has no personal knowledge of the reasons why the countries adopted an ESE standard, any such knowledge would be based on hearsay evidence, and Mr. Heary has no expertise to interpret the existence of foreign standards as a scientific consensus. For these reasons, Mr. Heary's statements interpreting the relevance of the foreign standards in ¶ 9 and ¶ 12 will be stricken.

Similarly, Plaintiff NLPC has provided no admissible evidence either that its product actually conforms to the French (or any other foreign) standard or that the conformance with that standard provides a basis for a measurable zone of protection. Mr. Rapp's testimony concerning compliance with the testing requirements is insufficient, because he does not have the scientific or technical expertise to interpret the results of any tests under foreign standards that may have been performed. Therefore, absent proof of compliance or expert testimony concerning the scientific underpinnings of such compliance, the

Court will strike the last sentence of ¶ 3 of Mr. Rapp's Affidavit. Mr. Rapp contends in his Supplemental Affidavit ¶ 13 [Doc. # 289] that he has no obligation to prove compliance with foreign standards. Again, Mr. Rapp is not a lawyer, and his legal conclusions in an Affidavit are not admissible, but Mr. Rapp and Plaintiffs misapprehend the burden of proof. If East Coast alleged false advertising on the basis of Plaintiffs not meeting an international standard, East Coast would bear the burden of proving that they did not in fact meet the standard. Here, East Coast has alleged a falsely claimed zone of protection, and Plaintiffs are relying on international standards to *refute* that allegation. Therefore, Plaintiffs bear the burden of showing compliance with and the scientific relevance of foreign standards.

On a final note, Mr. Rapp provided no evidence of the actual standards himself until filing his Supplemental Affidavit on Jan. 13, 2003. Exhibit B to the Supplemental Affidavit purports to contain the text of the international standards (though not proof of compliance), but, further supporting the conclusion of the need for expert testimony, attaches a document untranslated from Spanish, one in a language that appears to be Romanian, one in French which appears to be a standard for Yugoslavia (or some previous incarnation of that country), and one in a language that may or may not be Czech. They are not in English, and Plaintiffs provide no translation; the Court will *sua sponte* strike those four documents from Exhibit B to Rapp's Supplemental Affidavit.[19] The admissible evidence concerning foreign standards does not create a genuine issue of material fact regarding a zone of protection for ESE devices.[20]

Plaintiffs' formula, and an alleged zone of protection.

19. Plaintiffs' Statements of Facts which are based on this evidence will be stricken as well. The Court will strike ¶¶ 5, 6 of Plain-

tiffs' Statement of Material Fact in Support of their Motion for Summary Judgment [Doc. # 245].

20. At times, Plaintiffs allude to the testimony of Gerard Berger, who at one time was dis-

### Scientific literature

Mr. Heary offers evidence that Plaintiffs relied upon the academic literature supporting the ESE concept in formulating its advertisements. These statements are admissible only to the extent that they show Mr. Heary and his companies relied upon these studies. These statements do not establish the truth of scientific principles or opinions contained in these studies. For one, Mr. Heary's testimony about the purported conclusions of the studies is inadmissible hearsay. Second, Mr. Heary has no scientific or technical background to purport that he understands these studies and can confirm that they are reliable. In contrast, Dr. Uman has the scientific and technical background to review the studies, testified that he did review them, and can also, as an expert witness, rely upon evidence that would be hearsay if relied upon by a lay witness. Because Mr. Heary is not competent to testify about the results of scientific studies, the Court will strike the following statements of Mr. Heary's July Affidavit: first sentence of ¶ 10, ¶ 11, first line of ¶ 19.

### Lack of reported failures

██ Plaintiffs repeatedly emphasize the lack of reported failures of ESE systems, a topic of which both Mr. Heary and Rapp have personal knowledge, to prove that ESE systems are effective. This "evidence" is not sufficient. The lack of reported failures does not itself provide support for a measurable zone of protection. In fact, the lack of failures requires a scientific or technical inference to support a claim of effectiveness or an enhanced

zone of protection; Plaintiffs must provide expert testimony establishing the inference. Moreover, the anecdotal evidence is not responsive to East Coast's attacks on the validity of the testing. East Coast's claim of literal falsity is established by attacking the foundation of the scientific tests, *see Southland*, 108 F.3d at 1139, but an anecdotal record of success does not buttress the *scientific* validity of testing.

### United States Army Technical Manual

In his Supplemental Affidavit, Mr. Heary attaches portions of a Technical Manual issued by the United States Army on September 10, 2001 ("Technical Manual"). Exh. A to Heary Supp. Aff.[21] The stated purpose of the Manual is "to familiarize qualified personnel with problem areas of supplying electrical power to automated data processing (ADP) systems." Technical Manual at 1–1. Describing ESE systems, the Army report lists ESE systems as one of three types of lightning protection system and suggests that "each should be considered." Technical Manual at 7–6. It further indicates that ESE systems "have successful track records proven by hundreds of installations" and that these systems "ha[ve] been successfully tested in U.S. labs where 95 percent of discharges tested were attracted away from conventional rods by these terminals." Technical Manual at 7–7.

██ The Court concludes that the Technical Manual is not admissible to the extent that it creates a genuine issue of material fact as to whether the tests reliably prove a measurable zone of protection

---

closed as an expert witness, but who now is offered only as a fact witness. Any testimony of the scientific or technical underpinnings of a foreign standard would require specialized scientific knowledge. Plaintiffs have withdrawn Dr. Berger as an expert witness, so his testimony is not admissible in that regard.

**21.** Mr. Heary volunteers that the submitted portions of the Technical Manual were "downloaded from the U.S. Army Corps of Engineers website," but provides no pinpoint citation. Heary Supp. Aff. ¶ 10. The document is available at http://www.usace.army.mil/publications/armytm/tm5–689.

or protection in open spaces. First, the Technical Manual is itself hearsay if offered to show that the tests are reliable. Rule 803(8) governs the admissibility of government records and reports and provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency... or (C) in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness," are admissible.[22] The Technical Manual is admissible to show that some member of the Army Corps of Engineers recommends that the Army considered using ESE systems, but it is not admissible to show *conclusions* reached by the author of the Technical Manual. Under Rule 803(8)(A), conclusions are not "activities of the office or agency." As for Rule 803(8)(C), there is no evidence in the Manual (and certainly no evidence from Mr. Heary) that the factual finding resulted from an investigation "made pursuant to authority granted by law," nor what kind of investigation the author conducted at all. Further, Dr. Uman's testimony establishes that the "sources of information ... indicate[ ] lack of trustworthiness," and there are no affirmative guarantees within the Technical Manual that the author has the expertise to evaluate the lightning tests, nor that the author undertook a comprehensive or reliable investigation of the scientific validity of lightning protection systems. As the Ninth Circuit has noted, "the district court's [*Daubert*] 'gatekeeper' role is not abrogated simply because the evidence falls under Rule 803(8)(C)." *Desrosiers v.*

*Flight Int'l of Florida Inc.*, 156 F.3d 952, 962 (9th Cir.1998) (holding district court did not abuse discretion in excluding factual findings of government report as untrustworthy where opinions were made by non-expert with no formal training). There is no evidence that the author had the scientific or technical expertise to support his or her conclusions, and the Plaintiffs may not circumvent that requirement of offering scientific or technical evidence merely because the Technical Manual is issued by the government. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (describing Rule 803(8)(C)'s "limitations and safeguards" as "the requirement that reports contain factual findings bars the admission of statements not based on factual investigation" and "the trustworthiness provision requires the court to make a determination as to whether the report, or any portion thereof, is sufficiently trustworthy to be admitted").

Second, the Technical Manual's conclusions about the tests' reliability are based on inadmissible hearsay. The author gives no indication that he or she has personal knowledge of the lightning tests, so the author's knowledge is based on reports of the tests, which are themselves hearsay without an exception. The factual findings must be excluded as hearsay on this ground as well. *See United States v. Chu Kong Yin*, 935 F.2d 990, 999 (9th Cir.1991) ("The mere fact that a document qualifies as a public record, however, does not ipso facto overcome the hearsay objection unless the document relates to an event to which the author could himself testify. This is for the reason that the public docu-

---

**22.** Rule 803(8)(A) and (C) provide the most relevant hearsay exceptions. The Army Manual is clearly not admissible as a business record pursuant to Rule 803(6) because Plaintiffs offer no evidence of a regularly conducted business activity nor the testimony of a custodian or otherwise qualified witness. Also, Rule 803(8)(B) does not apply because Plaintiffs provide no evidence of a "duty imposed by law as to which matter there was a duty to report."

ments exception to the hearsay rule is only the substitute for the appearance of the public official who made the record.") (quoting *Yaich v. United States,* 283 F.2d 613, 616 (9th Cir.1960)).

Third, even if admissible, the Manual itself limits its intended scope. It disclaims that "[t]his manual is not intended as a replacement for the engineering text furnished as part of ADP system components, but rather, should be used to supplement and better evaluate established design practices." Technical Manual at 1–1. The Technical Manual is, at best, a generalized guide, not an offer of proof of the subjects that it summarizes. Finally, the Manual makes no mention about specified zones of protection or open spaces, and does not reference any standard for the installment of ESE systems (although it does repeatedly cite NFPA 780). For these reasons, the conclusions of the Technical Manual regarding ESE systems are both inadmissible and irrelevant if offered to prove the scientific validity of the tests underlying Plaintiffs' advertisements.

### D. Remedies

Because Plaintiffs have no admissible evidence to controvert the expert testimony of Dr. Uman, the Court must grant summary judgment in part against Plaintiffs. East Coast offers Dr. Uman's testimony to "demonstrate that the tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." *Southland,* 108 F.3d at 1139. In response, Plaintiffs present no admissible evidence to create a genuine issue of material fact that the tests are actually reliable. Therefore, Plaintiffs' claims that their ESE products provide a measurable zone of protection and protect against lightning strikes in open spaces are not supported by tests sufficiently reliable to support those claims, and are "literally false" under the Lanham Act.

The Court must determine the appropriate remedy. In its summary judgment papers, East Coast indicated that it sought both disgorgement of Plaintiffs' profits and injunctive relief against false advertising. In response, Plaintiffs argued that East Coast should be limited to only injunctive relief, since injunctive relief was the extent of the relief requested in the Counterclaim. East Coast did not address Plaintiffs' argument about damages, and at the hearing, East Coast conceded that it was only seeking injunctive relief.

In arguing against injunctive relief, Plaintiffs contend that granting injunctive relief would require the Court to administer a broad and intrusive injunction to regulate the lightning protection industry. Plaintiffs' arguments are overstated. For example, Plaintiffs argue that an injunction "would place the Court in the position of ordering that all lightning protection systems be installed in compliance with NFPA and U.L. standards" and "effectively prevent[ ] any competing systems of lightning protection from being sold or distributed in the United States." Pl's MSJ [Doc. # 235], at 4. These claims are unfounded, because the injunction would only affect Plaintiffs' advertising, not compliance standards or distribution. Now that the Court has determined that summary judgment should be granted for East Coast, the Court suspects that Plaintiffs' view of the scope of the injunction will be narrower.

In fact, Plaintiffs do repeatedly allude to the fact that any injunction against advertising must be carefully tailored to comply with the First Amendment's protection of free speech. The Court is not presented with a precisely-worded injunction to consider on the cross-motions for summary judgment. Therefore, the Court will order East Coast to submit a proposed injunction as part of a proposed form of judg-

ment, and the Court will allow Plaintiffs to file objections, East Coast to file a response, and Plaintiffs to file a reply. The parties should address any First Amendment issues relating to the scope of the injunction, as well as any other pertinent objections.

## IV. PLAINTIFF'S LANHAM ACT CLAIMS AGAINST THOMPSON AND STEFFES

Plaintiffs have sued Thompson and Steffes for literal false advertising under § 43(a) of the Lanham Act as well.[23] Thompson and Steffes have filed a Motion for Summary Judgment Re: Lanham Act [Doc. # 248]. In response, Plaintiffs have narrowed their challenge to two particular advertisements.

First, Plaintiffs contend that one brochure for Thompson's own ESE product, the Emitter, attached as Exh. 4 to PSOF, constitutes literally false advertising. The brochure contains two pages in dispute. The first page notes that, "[t]he Emitter has been developed to fill the need for an improved 'Early Streamer' air terminal. Early streamer air terminals produce a greater level of ionization. Such ionization allows the development of a rising streamer . . . expanding the zone of protection." It continues, "[a]dvantages offered by the Emitter are: a wider range of protection per air terminal. . ." The next page is captioned, "The Emitter: Field Tested Superior." It reports the results of the New Mexico Tech test and claims, "[t]hese Tables indicate that the Emitter air terminal provided the greatest level of ionization enhancement." Plaintiffs attack the brochure as literally false by questioning the accuracy of its reliance on the New Mexico Tech testing.

Thompson and Steffes respond persuasively that this brochure for the Emitter is not an advertisement of the type identified in the Lanham Act claim in Plaintiffs' Second Amended Complaint. Paragraph 116 of the Second Amended Complaint alleges that Thompson and Steffes "have engaged in making false statements concerning Plaintiffs' products which have misled and deceived consumers as to the safety and efficacy of ESE systems and as to the superiority of ESE Systems over Faraday Systems." In marked contrast, the Emitter brochure makes no mention of Plaintiffs' products and actually promotes, rather than disparages, ESE technology. Paragraph 117 references twelve other paragraphs containing allegations of false statements by Thompson, Steffes, or East Coast, but none of those particular allegations encompass Thompson's brochure for the Emitter; each paragraph concerns specific statements—many discussed in Section I under the Sherman Act—made allegedly to disparage ESE technology. Finally, paragraph 118 repeats the allegation of "false statements and conduct misleading and deceiving customers as to the safety and efficacy of ESE systems and as to the relative merits of ESE Systems and Faraday Systems." Even under Rule 8(a)'s liberal pleading requirements, the Second Amended Complaint simply does not allege that Thompson or Steffes engaged in false advertising by *promoting* their own ESE device on the basis of the New Mexico Tech tests. On the contrary, it alleges false advertising on the basis of disparaging ESE products. Therefore, Thompson and Steffes's motion for summary judgment regarding the Emitter brochure will be granted.

---

**23.** In their Second Amended Complaint, Plaintiffs also alleged that the same literally false advertising statements supported a claim for common law unfair competition. At the

hearing, the parties clarified that these common law unfair competition claims were also abandoned along with the common law claims discussed in Part V.

■ Plaintiffs also contend that another flyer distributed by Thompson contains literally false statements about Plaintiffs' product guarantee. Plaintiffs present a Thompson flyer with the caption, "Promotional Insurance Guarantee Deceptive." Exh. 22 to PSOF. The text continues, "[i]t is implied that this guarantee provides $6 million in coverage to make repairs to property. This is not the case. This is merely a product guarantee..." Neither this excerpted section nor the rest of the paragraph make any mention of *whose* product guarantee the flyer is criticizing. The flyer references only "this" guarantee, and the rest of the flyer references only general ESE systems, not Plaintiffs in particular. Plaintiffs' name appears nowhere in this document, and Plaintiffs fail to provide any context that could allow a factfinder to conclude the flyer is a reference to them at all. Plaintiffs thus fail to establish an essential element of a Lanham Act claim, "a false statement of fact by the defendant ... about its own or another's product." *Southland,* 108 F.3d at 1139. Summary judgment must be granted in regard to this flyer as well.

Plaintiffs provide no other allegedly false advertisements other than these two. Therefore, Thompson and Steffes's Motion for Summary Judgment Re: Lanham Act [Doc. # 248] will be granted.

## V. PLAINTIFFS' REMAINING CLAIMS AND MOTION FOR SANCTIONS

Plaintiffs originally sued East Coast on Lanham Act claims (Count II), common law unfair competition claims (Count III), and interference with contract (Count IV), and sued LPI on Count III as well. East Coast and LPI have moved for summary judgment on these claims, and Plaintiffs have decided to concede all of them. *See* Pl's Resp. to Summ. Judg. Re: Common Law / Lanham Act [Doc. # 276], at 2–4. Therefore, the Court will grant the following motions for summary judgment: Defendant East Coast Lightning Equipment's Motion for Summary Judgment Re: Count II Lanham Act Claims and Count III Common Law Claims [Doc. # 234], Defendant East Coast Lightning Equipment's Motion for Summary Judgment Re: Interference with Contract [Doc. # 241], and Defendant Lighting Protection Institute's Motion for Summary Judgment on Count III [Doc. # 226].

In response to Plaintiffs' concession of these claims, East Coast in its Reply requested sanctions and/or attorneys' fees for costs incurred in preparation of the summary judgment motions on Count II, III, and IV. East Coast argued that "these issues have been pending since 1997, Plaintiffs have twice amended their Complaint, [and] Defendant East Coast Lightning has spent thousands of dollars in discovery and motions responding to these claims." Def.'s Reply [Doc. # 298]. At the hearing, the Court instructed East Coast to brief the issue of sanctions, and East Coast has filed a Motion for Sanctions Against Plaintiffs and Their Counsel [Doc. # 333].

In response, Plaintiffs contend that the claims have merit, but that Plaintiffs chose not to pursue them for what can only be characterized as ambiguous "strategic" reasons. On Count IV, Plaintiffs alleged interference with contract with ETL, the testing laboratory. Plaintiffs decided not to pursue the claim sometime after winning an award in a breach of contract case against ETL in New York. Plaintiffs' reasons for abandoning Counts II and III are not based on recent developments or evidence: "Plaintiffs have determined that—although this raises an issue of fact for the jury—to continue to pursue these claims against Defendants East Coast and LPI would unduly complicate a trial in this action. Therefore, Plaintiffs have determined not to pursue

these claims." Pl's Resp. at 3–4 [Doc. #276].[24] In their Opposition to the Motion, Plaintiffs emphasize that they failed to oppose the summary judgment motions "solely for strategic reasons." Opp. [Doc. #334] at 9. In an affidavit, Plaintiffs' counsel Ms. Joseph avers that she "was concerned that providing a detailed explanation could reveal Plaintiffs' trial strategy and information protected by the work product privilege" and that she made "strategic decisions." Aff. of Joseph, attached to Opp. [Doc. #33] at ¶¶ 12, 13.

East Coast moves for sanctions and attorneys' fees on the basis of Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and the Court's inherent powers.

Sanctions may be imposed under Fed. R.Civ.P. 11 for the filing of a paper "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed. R.Civ.P. 11(b)(1). Rule 11 governs only papers filed with the court. *See* Fed. R.Civ.P. 11; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Primus Auto. Fin. Serv., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir.1997). Further, "Rule 11 . . . imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers*, 501 U.S. at 47, 111 S.Ct. 2123. *See G.C. & K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096, 1110 (9th Cir.2003) ("As with frivolous pleadings, whether a paper is filed for improper purpose is tested by objective standards.") (quotations omitted). A motion for Rule 11 sanctions "shall not be filed with or presented to the court, unless, within 21 days after service of the motion [on the opposing party] the challenged paper, claim, defense, contention, allegation, or

denial is not withdrawn or appropriately corrected." Fed.R.Civ.P. 11(b)(1)(A). Reasonable attorney's fees can only be collected if the Rule 11 violation is imposed on motion. *See* Fed.R.Civ.P. 11(c)(2).

 Title 28 U.S.C. § 1927 provides that "[a]ny attorney . . . admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 sanctions must be supported by a finding of subjective bad faith, which is present when an attorney knowingly or recklessly raises a frivolous argument. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002) (citing *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir.1996)). Section 1927 applies only to unnecessary filings and tactics once a lawsuit has begun. *Keegan*, 78 F.3d at 435. As such, an attorney is subject to sanctions under this section for all proceedings other than the filing of the complaint. *Id.* "For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass . . . ." *B.K.B*, 276 F.3d at 1107 (quoting *Keegan*, 78 F.3d at 436).

 Finally, the Court possess the inherent power to sanction. "Courts of justice are universally acknowledged to be vested, by their creation, with power to imposed silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). *Chambers* emphasizes

---

**24.** Plaintiffs also allude to representations made by NFPA about the 780 standard in 1997 or 2000, and though the relevance of these statements is unclear, it is uncontested that the NFPA's position did not change in the year before the summary judgment motions were filed.

the continuing need for Courts to use the inherent power, because it is "both broader and narrower than other means of imposing sanctions." *Id.* at 46, 111 S.Ct. 2123. Because of their very potency, inherent powers must be exercised with restraint and discretion. *Id.* at 44, 111 S.Ct. 2123. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. *Id.* at 44–45, 111 S.Ct. 2123. The "less severe sanction" of an assessment of attorney's fees is undoubtedly within a court's inherent power. *Id.* at 45, 111 S.Ct. 2123. A district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct. *Fink v. Gomez,* 239 F.3d 989, 992 (9th Cir.2001). Regardless of whether behavior constitutes bad faith *per se,* reckless and knowing conduct that is tantamount to bad faith is sanctionable under the court's inherent power. *B.K.B.,* 276 F.3d at 1108. An attorney's recklessness, when coupled with frivolousness, harassment, or improper purpose, is sanctionable under a court's inherent power. *Fink,* 239 F.3d at 994.

■ Plaintiffs are correct that Rule 11 sanctions are not available here because East Coast did not serve its motion on Plaintiffs pursuant to Rule 11(c)(1)(A)'s "safe harbor" before filing the motion with the Court. East Coast argues that compliance with the safe harbor would have been pointless, because East Coast is attacking Plaintiffs' *failure to withdraw* its claim before papers were filed, not the filing of a particular paper. Putting aside the question of whether this conduct is sanctionable under Rule 11, because the Rule applies only to written pleadings East Coast is not excused from complying with the formal requirements of serving a Rule 11 motion. The Ninth Circuit has clearly held that Rule 11's safe harbor requirements are mandatory, and it would be an abuse of discretion for the Court to excuse or waive

them. *Radcliffe v. Rainbow Construction Co.,* 254 F.3d 772, 789 (9th Cir.2001); *Barber v. Miller,* 146 F.3d 707, 710–11 (9th Cir.1998). In response, Plaintiffs also suggest that the Court award them attorneys' fees for being forced to respond to East Coast's failed Rule 11 motion. However, East Coast's Rule 11 failure was technical and not a decision on the merits.

■ The Court finds that Plaintiffs pursuit of Counts II, III, and IV against East Coast was in bad faith, with the purpose to harass and increase litigation expense by prompting unnecessary motions for summary judgment, and that this conduct merits an award of attorneys' fees under § 1927 and the Court's inherent power. As of July 2001 at the latest, when Plaintiffs prevailed on their contract claim in New York, Plaintiffs were aware of the same factual bases of their claims under Counts II, III, and IV that exist today. Plaintiffs had one year to determine whether to pursue those claims before East Coast filed its motions for summary judgment in July 2002. Again, Plaintiffs indicate that they conceded the summary judgment motions for the elusive "strategic" reasons, but the Court is at a loss to understand what sort of *defensible* strategy supported the decision to concede Counts II, III, and IV. Plaintiffs admit that no set of facts changed between the time East Coast filed the summary judgment motions and Plaintiffs' decision to concede the motions. Yet Plaintiffs had an obvious motive for not conceding those claims until after the initial round of summary judgment motions, which is that East Coast would incur fees and spend more time defending four claims instead of one, the Sherman Act claim which Plaintiffs now admit is the focus of their Complaint.

The Court is left to conclude that Plaintiffs engaged in ignoble defiance of legal

and professional conduct. Plaintiffs had no intention, for perhaps a year before filing of summary judgment motions, to pursue Counts II, III, and IV at all, but purposely waited until after East Coast filed its motions for summary judgment to concede those claims.[25]

■ As a final response in the surfeit of meritless arguments, Plaintiffs repeatedly insist that the original claims have legal merit, even if Plaintiffs chose to concede the summary judgment motions. This argument is simply not a defense, because the possible legal merit of Plaintiffs' claims is not controlling to a finding of bad faith. There must be some virtue in Plaintiffs' abandonment of them after Defendants were prejudiced by preparing and filing responses. When awarding sanctions under the inherent power of the Court, "a finding of bad faith does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar the assessment of attorney's fees." *B.K.B.*, 276 F.3d at 1108 (quoting *Fink*, 239 F.3d at 992). Moreover, an attorney may be sanctioned for improper conduct under § 1927 whether or not he or she filed a paper containing misstatements. *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir.2001). "Tactics undertaken with the intent to increase expenses or delay may also support a finding of bad faith [under § 1927]." *New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir.1989). Plaintiffs' counsel's persistence in maintaining the additional claims without rational explanation before East Coast briefed the motions for summary judgment is sanctionable because it unreasonably and vexatiously multiplied the proceedings and it was Plaintiffs' intention to do so.

Plaintiffs will be ordered to pay the reasonable attorneys' fees and costs incurred by East Coast in filing its two summary judgment motions on Counts II, III, and IV.

Accordingly,

**IT IS ORDERED** that Defendants' Daubert Motion to Exclude Opinions Offered by Louis Guth [Doc. # 251] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Count I): No Damages [Doc. # 249] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Count I): Lack of Proof of Causation [Doc. # 316] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant East Coast Lightning Equipment's Motion for Summary Judgment Re: Count II Lanham Act Claims and Count III Common Law Claims [Doc. # 234] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant East Coast Lightning Equipment's Motion for Summary Judgment Re: Interference with Contract [Doc. # 241] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Lighting Protection Institute's Motion for Summary Judgment on Count III [Doc. # 226] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment against Defendant East Coast Lightning Equipment on Counterclaim [Doc. # 235] is **GRANTED IN PART** and **DENIED IN PART** as explained in this Order.

**IT IS FURTHER ORDERED** that Defendant East Coast Lightning Equip-

---

25. Certainly, the Court is not prepared to conclude that Plaintiffs' counsel is inept and incapable of perceiving the merit and quality of its claims and arguments.

ment's Motion for Summary Judgment Regarding Counterclaim [Doc. #240] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment Regarding Failure to Establish Conspiracy [Doc. #247] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Count I: No Anti–Competitive Effect / No Antitrust Injury [Doc. #232] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants Allan Steffes and Thompson Lightning Protection's Motion for Summary Judgment Regarding Count II Lanham Act Claims [Doc. #248] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Allan Steffes and Thompson Lightning Protection's Motion for Summary Judgment Regarding Count III [Doc. #230] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiffs' Sherman Act Statement of Facts [Doc. #293] is **GRANTED IN PART** and **DENIED IN PART** as explained in this Order.

**IT IS FURTHER ORDERED** that East Coast's Motion to Strike Plaintiffs' Counterclaim MSJ Statement of Facts [Doc. #272] is **GRANTED IN PART** and **DENIED IN PART** as explained in this Order.

**IT IS FURTHER ORDERED** that Defendants' Motion for Order to Depose Linda H. Joseph [Doc. #261] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Permit Late Filing of Opposition [Doc. #320] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant East Coast's Motion for Sanctions [Doc. #333] is **GRANTED**. Plaintiffs shall pay the reasonable attorneys' fees and costs incurred by East Coast in filing

East Coast Lightning Equipment's Motion for Summary Judgment Re: Count II Lanham Act Claims and Count III Common Law Claims [Doc. #234] and East Coast Lightning Equipment's Motion for Summary Judgment Re: Interference with Contract [Doc. #241].

**IT IS FURTHER ORDERED** that Defendant East Coast shall submit a Proposed Form of Judgment regarding the Counterclaim, including a Proposed Injunction, by November 17, 2003. Plaintiffs shall file Objections by December 1, 2003, East Coast shall filed a Response by December 15, 2003, and Plaintiffs shall file a Reply by December 22, 2003.

**IT IS FURTHER ORDERED** that this Order supersedes and amends the Court's Order of March 31, 2003 [Doc. #330] and any previous rulings inconsistent with this Order are hereby amended.

**IT IS FURTHER ORDERED** that the Second Amended Complaint [Doc. #206] is **DISMISSED WITH PREJUDICE**.